87 N.J. Super. 23 (1965)
207 A.2d 711
MERCK & CO., INC., PLAINTIFF,
v.
BIORGANIC LABORATORIES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, NATHAN SHARFF AND SEYMOUR SALB, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 10, 1965.
*25 Mr. Arthur R. Schmauder for plaintiff (Messrs. Shanley & Fisher, attorneys).
Mr. Walter D. Van Riper for defendants Nathan Sharff and Seymour Salb (Messrs. Van Riper & Belmont, attorneys).
MATTHEWS, J.S.C.
In this proceeding plaintiff Merck & Co., Inc. (hereinafter Merck) seeks an order compelling defendants Sharff and Salb to answer certain questions propounded to them on depositions.
In its complaint plaintiff alleged that defendants induced former employees of Merck, including one Osborne, to give and disclose Merck trade secrets, know-how, micro-organisms and other property, all pertaining to the manufacture of Vitamin B[12], to persons engaged in the Italian Pharmaceutical Industry, including but not limited to defendants and Ankerman-Italiana, S.p.A. Plaintiff also alleged that the above activities constituted a conspiracy; that defendants owned a financial interest in Ankerman-Italiana, S.p.A., and that defendants acted maliciously, wrongfully and deliberately to cause interference with Merck's contractual relationships with its employees, to cause breach of fiduciary relationships, and, further, to cause unfair competition, conversion of Merck's property and unjust enrichment. The relief demanded included an accounting and return of all profits and earnings by defendants to Merck, injunctive orders, and compensatory and punitive damages.
Initially, depositions were taken of Sharff and Salb on the issues of liability. Meaningful discovery was successfully frustrated by activities of defendants, by refusal to answer and the destruction of documents. The issues of liability have now been substantially eliminated from the case by an order of this court, entered December 14, 1962, which struck defendants' answer, entered a default against them, and directed plaintiff to proceed pursuant to R.R. 4:56-2(b). That order was affirmed by the Appellate Division in an opinion reported in 82 N.J. Super. 86 (App. Div. 1964).
*26 After the issuance of the mandate on affirmance, plaintiff served defendants Sharff and Salb on January 21 and January 22, 1964 with notice that their oral depositions would be taken on February 3, 1964 as to the issues of damages. A deposition session was finally conducted on April 2, 1964, and again on August 11, 1964. In each instance the individual defendants refused to answer questions propounded to them, invoking the privilege against self-incrimination.
Plaintiff now contends that Sharff and Salb, having heretofore on July 27 and September 10, 1962 voluntarily appeared and testified on the merits of this action in depositions, should now be regarded as having effectively waived their rights to invoke the privilege.
There can be no dispute but that at the deposition sessions of July 27 and September 10, 1962 both individual defendants testified as to various areas concerning the substantive merits of this action. Thus, in his testimony on July 27, Salb described the nature of defendants' business, some of their dealings with Osborne, knowledge concerning Merck B[12] information possessed by Osborne or Ankerman, knowledge of Osborne's and Ankerman's dealings, trips to Ankerman by defendants and Osborne, B[12] discussions by defendants, and B[12] work at Ankerman. In the September 10, 1962 session, Sharff discussed documents concerning dealings between defendants, Ankerman and Osborne, and the interest of defendants in Ankerman-Italiana. These are the matters which it is claimed constitute testimony by defendants on the merits in the action and, therefore, constitute an effective waiver of any claim of the privilege each may otherwise have had to remain silent.
In the further support of its argument for the order sought here, plaintiff cites N.J.S. 2A:84A-19 (Rule 25), specifically subsection (d) thereof, which reads:
"Subject to Rule 37, every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate, except that under this rule:

*27 * * * * * * * *
(d) subject to the same limitations on evidence affecting credibility as apply to any other witness, the accused in a criminal action or a party in a civil action who voluntarily testifies in the action upon the merits does not have the privilege to refuse to disclose in that action, any matter relevant to any issue therein."
This rule, it is contended, in view of defendants' voluntary appearance and testimony as to matters concededly embraced within the merits of this action, compels a finding that they have created an effective waiver of their rights to invoke the privilege against self-incrimination.
It should also be mentioned at this juncture that on the occasion of the deposition sessions of July 27 and September 10, 1962, both Sharff and Salb in several instances consistently refused to answer what might have been regarded as patently relevant questions, on the ground that they were irrelevant and immaterial; in no instance was the privilege against self-incrimination invoked by either defendant; further, it should be observed, suggestions that the right to invoke the privilege was being retained by each may be found in the deposition record.
In answering these arguments defendants point out that at the time they appeared at the office of plaintiff's attorneys for deposition purposes, Sharff was already under federal indictment in the Southern District of New York, and that, subsequently, a second indictment was returned against him in the same jurisdiction. The latter indictment also included Salb as a defendant. While it is conceded that the indictments in question do not refer to plaintiff herein, the second indictment does charge, in numerous counts, both Sharff and Salb (together with several other named defendants) with having entered into a conspiracy to transport, and actually having transported, certain quantities of micro-organisms and quantities of other drug products from one state to another, and from the United States to Rome and Milan, Italy. The indictment specifically refers to these products as having been acquired by Sharff and Salb (and others) unlawfully, and by *28 fraud. Defendants contend that in this setting  the original indictment against Sharff having been handed up during the month of November 1962  the danger of incrimination is real and not speculative, and, accordingly, the privilege should not be regarded as having been waived on some technical or some frivolous ground.
Defendants also contend that their acts of testifying at the deposition sessions in 1962 cannot be considered to constitute a waiver within the meaning of N.J.S. 2A:84A-19(d), supra, since the merits of the present controversy were determined by the entry of the default by order of this court, as hereinbefore mentioned. It is contended that since the only purpose of the present questions is to ascertain defendants' financial standing for damage purposes, the question of liability on the main case, or "on the merits," having been disposed of (and defendants' testimony at the deposition sessions not having touched on this subject matter), they cannot now be regarded as having appeared and testified "on the merits" as that concept may relate to the issue of damages.
A third argument in opposition is that the appearance by Sharff and Salb at the deposition sessions in 1962, and their testimony thereat, did not constitute "voluntary" testimony in the action, within the meaning of Rule 25  this because each was at the deposition sessions under the compulsion of process issued by plaintiff. Because of the issuance of process and the compliance of each with the same, their appearance cannot be regarded as being voluntary. This is so, it is argued, because the provision of Rule 25, insofar as it attempts to preclude a witness from resorting to use of the privilege, is intended to cover a situation where the witness (usually a defendant) takes the stand of his own accord in defense of himself or another (if he be a witness and not a defendant), and after having freely and voluntarily testified either on his own behalf or in the interest of another, seeks when being cross-examined to refrain from answering questions concerning the subject matter of which he has already testified. This is the *29 kind of situation, it is argued, that the court had in mind in State v. DeCola, 33 N.J. 335, 345 (1960) when it stated:
"* * * [S]ince disclosure of only a part may garble the truth and be more mischievous than no testimony at all, there is pressure to expand whatever `waiver' may have occurred. * * *" (at p. 345)
In short, defendants contend under this argument that not having appeared voluntarily, the provisions of subparagraph (d) of N.J.S. 2A:84A-19 are not applicable to them.
Defendants also argue that the provisions of Rule 37 (N.J.S. 2A:84A-29), incorporated by reference in Rule 25, specifically that portion which reads:
"* * * The failure of a witness to claim a right or privilege with respect to 1 question shall not operate as a waiver with respect to any other question."
clearly and affirmatively grant to the witness (i.e., defendants in this case) the right to invoke the constitutional privilege in the manner in which they did. Further, as to this point, defendants urge that even without the protection of Rule 37, they continue to enjoy the privilege because they had the right to stop short in their testimony, whether the same be regarded as having been to the merits or not, whenever either could fairly claim that the answer to a question propounded might tend to incriminate him. In support of this argument there is cited Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920) rehearing denied 254 U.S. 379, 41 S.Ct. 136, 65 L.Ed. 314 (1920), and Matter of Neff, 206 F.2d 149, 36 A.L.R.2d 1398 (3 Cir. 1955).
It is apparent from the foregoing that the hazard of incrimination exists as to both individual defendants. While this statement may be regarded as an evaluation of the situation on my part  see In re Pillo, 11 N.J. 8, 19 (1952); State v. DeCola, supra  it is submitted that a mere perusal of the facts as outlined above, considered in light of the pending indictments, leads inescapably to such a conclusion. The ground for the invocation of the privilege having been established, *30 the question for resolution is whether the activities of the individual defendants in testifying at the deposition sessions, considering both the fact of testifying and the nature of the testimony given, are sufficient to constitute a voluntary surrender of the privilege on the part of each.
Since the decision of the Supreme Court of the United States in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), it is the law of the land that the Fourteenth Amendment to the Constitution of the United States guarantees to all natural persons the protection of the Fifth Amendment's privilege against self-incrimination, and that the standards to be applied with respect to the applicability of the privilege in all situations must be those established under federal law. The Malloy court held that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the states. In view of this holding, the vitality of Rules 25 and 37 must be tested in the light of federal precedents.
The privilege against self-incrimination is not susceptible to precise definition. It should not be regarded as a single right, but rather a complex of several separate rights, each differing in legal effect according to the factual background in which it is invoked. See 8 Wigmore, Evidence (McNaughton rev. 1961), §§ 2250-84. Regardless of its complex nature, it has long since been established that it can be waived by one who has the right to its protection. One of the common methods found of waiving its protection is through the voluntary self-incriminating testimony by a witness. While the raison d'etre of the privilege may be readily accepted as weighty evidence of civilized man's revulsion for heavy-armed criminal procedures, its existence must of necessity involve some sacrifice of competing interests. When it acts to deprive a court or jury of relevant testimony by a witness, the result is that there must inevitably be some distortion of the truth. As was stated by our Supreme Court in State v. DeCola, supra:
*31 "* * * manifestly it affects the interests of litigants who are denied the benefit of the facts the witness conceals under his personal privilege." (33 N.J., at p. 341)
Again, because of its complex nature, no precise formula can be established to ascertain whether the activity of one seeking to invoke the privilege was such in the past as to have constituted a relinquishment of the right. The hornbook definition of waiver is usually recited as "the voluntary relinquishment of a known right." Such a definition suggests a knowing release by an individual of a right possessed by him. In United States v. Kimball, 117 F. 156 (C.C.S.D.N.Y. 1902), it was stated:
"The provision [referring to the privilege] means that no person shall be forced to be a witness against himself against his free will. This does not mean that he may not be a witness against himself; * * *. Hence those competent and free-willed to do so may give evidence against the whole world, themselves included; but those unwilling may not be coerced, if it appear that the unwillingness arises from incriminating evidence which they are asked to give. But willingness or unwillingness is subjective, and may be known alone by act, conduct, speech, or perhaps, in extreme cases, by condition. Unless the witness exhibit his unwillingness in some manner, it cannot be presumed to exist. * * * From this it follows that in a legal sense the doctrine of waiver has no application. The constitution intends that a person shall not give incriminating evidence under compulsion. Immunity from compulsion is the right reserved. * * * The right of not being compelled, in its very nature, does not admit of waiver. Compulsion and consent  i.e.,  waiver  cannot coexist." (at p. 163)
Considering this, it would seem that the concept of waiver through testimony is an illusory one. As one author has put it, the finding of waiver by a judge because of testimony elicited by a witness constitutes no more than the product of judicial mind-reading. See 14 Stanford L. Rev., 811, 813 (1962).
Arndstein v. McCarthy, supra, involved a hearing under section 21 of the Bankruptcy Act in which the involuntary bankrupt, who had filed a schedule of his assets, was held to have waived the privilege as to all questions relating to his financial position. His continued refusal to testify resulted in *32 a conviction for contempt. On appeal, the United States Supreme Court reversed, stating:
"The schedules, standing alone, did not amount to an admission of guilt or furnish clear proof of crime, and the mere filing of them did not constitute a waiver of the right to stop short whenever the bankrupt could fairly claim that to answer might tend to incriminate him. See * * * Foster v. People, 18 Mich 266, 274; * * * Regina v. Garbett, 2 C. & K. 474, 495 [1 Den. C.C. 236, 2 Cox, C.C. 448]. It is impossible to say from mere consideration of the questions propounded, in the light of the circumstances disclosed, that they could have been answered with entire impunity." (254 U.S., at p. 72, 41 S.Ct., at p. 26)
The two decisions cited in the quotation, Regina v. Garbett, 2 Car. & K. 474, 175 Eng. Rep. 196, 205 (Ex. 1847), and Foster v. People, 18 Mich. 266 (Sup. Ct. 1869), are both pertinent to our inquiry. Garbett was perhaps the first case to consider the effect of prior testimony on the privilege. There, the defendant, charged with forging a negotiable bill, admitted to being present when the forgery took place, but did not respond to other questions concerning the transaction. The trial court ordered him to answer on the theory that his incriminating disclosures operated as a complete waiver of the privilege. On appeal, Exchequer reversed, holding that whatever the connection of his previous testimony, "if a witness claims the protection of the court on the ground that his answer would tend to criminate himself, and there appears reasonable grounds to believe that it would do so, he is not compellable to answer; and if obliged to answer notwithstanding, what he says must be considered to have been obtained by compulsion, and cannot afterwards be given in evidence against him."
In Foster the prosecution in a trial for grand larceny called Foster, a suspected accomplice, to testify against defendant. On the stand Foster completely and unequivocally admitted his part in the theft. The court held that in so doing, he had waived his privilege as to further questions put to him on cross-examination, stating:
*33 "The right to decline answering as to minor facts is merely accessible to the right to decline answering to the entire incriminating charge, and can be of no manner of use when that is once admitted. * * * The law does not endeavor to preserve any vain privileges, and such a privilege as would allow a witness to answer a principal incriminating question, and refuse to answer as to its incidence, would be worse than vain; for, while it could not help the witness it must inevitably injure the defendant * * *." (18 Mich., at p. 275)
In Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), Mrs. Rogers, as a witness before a federal grand jury, testified that she was the treasurer of the Communist Party of Denver, and by virtue of that position had at one time been in possession of the party's books and records. She invoked the privilege for the first time when asked to disclose the identity of the person to whom the books had been transferred. Failing to answer, she was convicted of contempt. On appeal, the Supreme Court upheld the conviction. It found that her testimony, freely given prior to the invocation of the privilege, was sufficient to constitute an admission of guilt as to a violation of the Smith Act, and in the premise there was no danger of further incrimination. The decision in Rogers evoked a great deal of speculation, both by writers and judges, with respect to its exact holding. It seems, however, that under the apparent holding of Rogers, once a witness has voluntarily given some testimony harmful to himself, the balance shifts. If he is to invoke successfully the privilege thereafter, he must show a much more substantial possibility of punishment because of further testimony.
All the cases just cited and discussed, except Arndstein v. McCarthy, involved criminal proceedings. In Brown v. United States, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), the Supreme Court ruled on the question of waiver of the privilege by a defendant in a civil action. Mrs. Brown came to the United States in 1912 at the age of two. She did not become a citizen until 1946. The Government moved to cancel her certificate of citizenship on the ground that it was obtained by fraud. It was contended that Mrs. Brown lied when in 1946 she stated that during the ten years prior she had not *34 belonged to any organization which believed in sabotage. She was also accused of being a person of bad moral character previous to her being granted citizenship, in that she lied in 1940 when, in an affidavit required by the Alien Registration Act, she had stated that she was not active in any clubs or organizations within the past five years. The Government also contended that the oath of allegiance she took during the citizenship ceremony was taken in bad faith. The United States attorney called Mrs. Brown as a government witness. She answered all questions pertaining to pre-1946 activities, but refused to answer any questions as to her activities taking place after her naturalization. Her claim of privilege as to these questions was upheld by the federal district judge. At this juncture of the proceeding she was not examined by her own counsel. After the Government rested its case, Mrs. Brown took the witness stand on her own behalf. In answering to a series of questions propounded to her by her own attorney, she testified that she was attached to the Constitution both now and prior to her naturalization. She stated that she would be willing to take up arms in defense of the United States, and that she had never advocated the overthrow of the Government or belonged to any organization advocating such overthrow. She also testified that she had resigned from the Young Communist League during the month of January 1935. On cross-examination the United States attorney asked several questions pertaining to events which occurred after 1946. Once again Mrs. Brown invoked the privilege, but the trial judge ruled that she had waived the privilege when she took the stand on her own behalf. Upon her continued refusal to answer, she was held in contempt. In its opinion, the District Court appears to have based its ruling solely on the finding that Mrs. Brown waived the privilege when she took the stand on her own behalf. The Circuit Court of Appeals, in affirming the conviction, based its affirmance on the finding that Mrs. Brown had testified at length in her own defense. Brown v. United States, 234 F.2d 140, 144 (6 Cir. 1956).
*35 In the majority opinion of the United States Supreme Court there was a finding of waiver of the privilege by defendant's taking the stand and voluntarily testifying. While the majority conceded that defendant had made no incriminating statements at any time, a waiver was found, nevertheless. In the course of the opinion it was stated:
"A witness who is compelled to testify, as in the Arndstein type of case, has no occasion to invoke the privilege against self-incrimination until testimony sought to be elicited will in fact tend to incriminate. * * *
On the other hand, when a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all." (356 U.S., at p. 155, 78 S.Ct., at p. 627)
It should be borne in mind that the person involved in Brown was a witness who was also a party to the action. It is apparent that the court was drawing a distinction between a witness who is involuntary, in the sense that his testimony is legally compellable, and a witness who is voluntary in the sense that he cannot be compelled to testify by the party calling him.
The discussion of the foregoing opinions leads to the conclusion that the privilege against self-incrimination is recognized as an exception to the duty of every witness to testify concerning events within his knowledge, as long as the basic policies upon which the privilege rests are found. When the witness, through voluntary disclosures in the past, has so changed the situation that continued testimony on his part would no longer tend to incriminate him, the privilege no longer applies, and his duty to testify becomes paramount. It is the activity of the witness himself which determines whether invocation of the privilege is available or not.
*36 In the present action there can be no dispute but that Sharff and Salg were not at any time in these proceedings voluntary witnesses. In each of the four deposition sessions mentioned, both were under the compulsion of process issued by plaintiff. While it is true that the privilege may be invoked by one who is called upon to testify at depositions, see R.R. 4:16-2, this right in itself does not answer the problem. The position of both Sharff and Salb at the deposition sessions may be likened to the position of Mrs. Brown as a witness in the Government's case against her in the denaturalization proceedings, or the position of the debtor in filing his schedules of assets or liabilities in the involuntary bankruptcy proceeding described in Arndstein v. McCarthy, supra. The holdings in both of these cases, i.e., Brown and Arndstein, clearly indicate that under such circumstances the act of testifying cannot be regarded as being voluntary. I am satisfied that the provisions of Rule 25(d) (N.J.S. 2A:84A-19(d)), which state that voluntary testimony on the merits by a party in a civil action constitutes a waiver of the right to invoke the privilege against self-incrimination, only come into play when such a person has taken the stand and testified in an action on the merits other than through the process of subpoena or the call of an adverse party. Under this view the provisions of this subparagraph of the rule are consonant with the federal precedents referred to above. Cf. Brown v. United States, supra.
Under the circumstances of this case, I need not determine whether one who is a party to an action and who has appeared and testified at depositions in response to a subpoena by his adverse party, may yet be found to have relinquished the privilege because of the very nature of his responses to questions propounded to him. See Rogers v. United States, supra. In short, I do not intend to conclude that the mere existence of process, as the vehicle for giving a party the opportunity to testify in a cause, albeit in depositions, itself constitutes a protective cloak akin to the privilege. In this regard, the observations of the Circuit Court in United States v. Kimball, quoted above, may be apposite.
*37 Under the facts presented here, a review of the deposition transcript leads me to the conclusion that the answers elicited both from Sharff and Salb at the deposition sessions fall short of incriminating either, considering both the indictments presently pending in the Southern District of New York and the alleged events and circumstances surrounding this whole bizarre transaction. In the transcripts there is readily apparent an implicit recognition by both of these defendants that the privilege was available to them and that it would be invoked should the area of questioning approach incriminating facts or circumstances.
Further, it is also observed that the issues of liability in this case have been determined adversely to defendants through the effective procedure of suppressing their defenses, because of the recalcitrant attitude on their parts during discovery proceedings. Hence, there is no danger that the true facts surrounding the liability issues will be garbled. United States v. St. Pierre, 132 F.2d 837, 147 A.L.R. 240 (2 Cir. 1942).
In view of the foregoing, the application for the order to testify is denied without costs.