STATE OF NEW JERSEY AND JAMES MCLELLAND SMITH, CHIEF, BUREAU OF SECURITIES, PLAINTIFFS-RESPON-DENTS, v. KOBRIN SECURITIES, INC., ARMAND DEANGEL-IS, ET AL., DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 10, 1986—Decided October 20, 1986.

162

Before Judges KING, HAVEY and MUIR.

*John A. Brogan* argued the cause for appellant Armand DeAngelis (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Justin P. Walder,* of counsel).

*Nancy Costello Miller,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Andrea Silkowitz,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

MICHAEL PATRICK KING, P.J.A.D.

█ This case involves the problem of waiver of the privilege against self-incrimination by testifying in a civil action. We granted leave to appeal to consider the appropriate scope of any waiver of the privilege. *R.* 2:2–4. We conclude that in this circumstance the appellant DeAngelis gave up his privilege against self-incrimination only to the extent of his prior voluntary disclosures made in this civil proceeding and the need for

effective cross-examination about them. He did not make a blanket waiver of the privilege, as the Law Division judge appears to have concluded.

This case was instituted in the Chancery Division by the Bureau of Securities against the defendants Kobrin Securities, Inc. and its former officers and employees, including appellant Armand DeAngelis, alleging violations of the Uniform Securities Law (1967), *N.J.S.A.* 49:3–47 *et seq.* On July 2, 1985 the State moved for injunctive relief seeking, among other things, the appointment of a receiver for DeAngelis and an order barring him from earning his livelihood as a broker and freezing his assets. The affidavit of Rick Barry, the Bureau's chief investigator, stated that DeAngelis was selling his condominium residence at the Admiralty in Monmouth Beach and also referred to a certification of Gregg McAulay, the Sales Manager of the Admiralty, who had advised Barry that DeAngelis had made a remark about moving to "one of the islands." On July 8 the Law Division judge entered an order requiring the defendants to show cause why a preliminary injunction should not be entered against them. On that same day, DeAngelis submitted a short responsive affidavit in which he stated that he "recognized that it was not the appropriate time to address specific factual allegations against him" but that he was "most concerned" with the State's effort to freeze his assets. He explained the reasons for his considering the sale of his condominium at the Admiralty and his statement to McAulay. He further said that his condominium, at that time, had been taken off of the market. The Bureau next submitted the certification of Maxine Rauch, attempting to rebut DeAngelis' statement that his condominium was no longer listed for sale. DeAngelis responded with a short, four-paragraph supplemental certification, dated July 16, 1985, explaining Rauch's misunderstanding and specifying his prior request to the real estate agent to take the condominium off the market.

On August 1, 1985 Judge Skillman (then assigned to this case) ruled on plaintiff's application for preliminary relief.

Judge Skillman expressly found that there was "voluminous evidence" that Kobrin Securities and its former employees, including DeAngelis, had violated the Uniform Securities Law, and that there was a substantial probability that the State would ultimately succeed on the merits of its claims against certain defendants, including DeAngelis. Those claims included allegations that DeAngelis had engaged in various practices that were designed to and did in fact defraud investors of substantial amounts of money.

In his decision of August 1, 1985 Judge Skillman noted that the State had sought an order freezing the assets of the defendants. He decided, based on the information before him, that there had not been a sufficient showing of immediate and irreparable harm to prevent the defendants from continuing to control their assets. But he stated

> At the same time I am very concerned by at least indications that Mr. DeAngelis may be laying the groundwork, for leaving this State and therefore on my own motion I am going to permit the plaintiff State to take the deposition of Mr. DeAngelis and other persons with respect to Mr. DeAngelis' assets as well as his plans with respect to the sale and disposition of those assets. And if that deposition, ... should provide some more substantial indications of the danger of flight, hence, immediate and irreparable injury, I would expect the State to renew this application.

During this hearing the State had raised the subject of the sale a second condominium DeAngelis' owned in East Brunswick. On August 23, 1985 Judge Skillman executed the order authorizing the plaintiffs "to take the deposition of Armand DeAngelis regarding his assets and the sale or disposition of those assets, for the time period January 1, 1984 to the present," together with any other person having knowledge of same."

DeAngelis then moved for reconsideration of the prior decision permitting the State to depose him with respect to the sale and disposition of his assets. DeAngelis also filed a second supplemental certification dated August 27, 1985 which explained that the East Brunswick condominium was an investment property which he always had intended to sell from the time he purchased it in August 1984. The remainder of DeAn-

gelis' August 27, 1985 certification set forth in summary fashion his ties to the State of New Jersey and reaffirmed his intent to be present and defend the matters in this case and to respond to any judgments and directions of the court. Counsel for DeAngelis was not then on notice of a grand jury investigation into Kobrin Securities' affairs being conducted by the New Jersey Attorney General's Office, Division of Criminal Justice.

The State again moved for an order compelling DeAngelis to submit to a deposition regarding his assets, for an order appointing a receiver for his assets, and for an immediate accounting of those assets. The motions were heard on September 10, 1985. The judge ruled that he had the authority to freeze the assets of DeAngelis as requested by the State, but noted that such authority must be cautiously employed and

... only should be exercised upon there being some substantial indication of an intent on the part of [a] party to leave the jurisdiction, to remove assets from the jurisdiction or to hide or dissipate assets.

The judge found that the additional affidavits presented by the State demonstrated that DeAngelis was preparing to leave the jurisdiction or place his assets beyond the reach of the persons he allegedly defrauded. The affidavits revealed that DeAngelis' fiancee had purchased bank cashier's checks totalling $34,000 with cash, $18,000 of which were purchased on July 17, 1985, the day following a motion in the Federal District Court for an attachment of defendant's assets, and two weeks after the State had filed its lawsuit. Some of the checks were later cashed in the Cayman Islands. The submissions also showed that DeAngelis had liquidated $500,000 in municipal bonds and deposited the proceeds in a Florida bank in late June 1985, shortly after the institution of administrative proceedings against him. The affidavits further revealed that DeAngelis was selling his East Brunswick condominium and that he had sold several expensive automobiles.

Confronted with the Bureau of Securities' application for the appointment of a receiver and an order freezing assets, defendant submitted an affidavit dated September 9, 1985 responding

to some of the matters raised in the State's papers. DeAngelis responded to the Bureau's affidavits by explaining the transactions in question and correcting certain alleged inaccuracies, but did not provide any further significant information regarding the existence or location of assets. Only after the filing of this affidavit, dated September 9, 1985, did defense counsel learn of the federal investigation being conducted into the affairs of Kobrin Securities by the United State's Attorney's Office.

The subject matter of the Bureau's civil complaint, and appellant DeAngelis in particular, was in fact being investigated by the Division of Criminal Justice, and by the United States Attorney's Office. During a deposition of Barry, the Bureau's chief investigator, on January 3, 1986, he acknowledged that there was complete cooperation between the Bureau and these prosecuting authorities, and that the Bureau had provided them with several documents related to this civil case.

The judge noted that DeAngelis had submitted an affidavit in which he asserted that the transactions did not reflect an intent on his part to flee the jurisdiction or to hide or dissipate assets. But based on the information before it, the judge found DeAngelis' statements unconvincing. The judge stated

... The liquidation of these substantial assets and the investment of the proceeds of the sale of these various assets out of state and with respect to—I believe it's sixteen or seventeen thousand dollars out of the country at the same time as this case and others against Mr. DeAngelis have been unfolding is simply a very—too much of a coincidence for this Court not to infer absent some further explanation and absent further development of the facts that there is not an intent to at least make things more difficult by way of pursuing the rights of those persons who have allegedly been defrauded by Mr. DeAngelis. Therefore, I have determined that only a freeze of his assets will provide a reasonable measure of protection to those investors allegedly defrauded.

The judge also ordered that DeAngelis provide the accounting sought by the State and reaffirmed his prior order mandating that DeAngelis submit to a deposition. The judge said: "It had been my intention when I authorized the taking of that deposition that it would have been taken by now." Judge

Skillman entered an order on September 19, 1985 which denied DeAngelis' motion to reconsider the earlier order authorizing the deposition. The order also stated that the judge was directing that

... defendant Armand A. DeAngelis provide counsel for the plaintiff with an accounting listing his assets within three (3) days from the entry of this Order and that depositions of Mr. DeAngelis shall be taken within five (5) days following receipt of said listing of assets; ...

DeAngelis thereafter sought leave to appeal to this court from the Law Division order of September 19, 1985. DeAngelis also moved the trial court for a stay of the order mandating the accounting and authorizing the deposition. Leave to appeal was denied by this court and the Supreme Court.

On October 28, 1985 counsel for DeAngelis advised the State by letter that DeAngelis would refuse to provide the accounting by reason of an assertion of a privilege against self-incrimination pursuant to the Fifth Amendment to the Constitution of the United States. On October 30, 1985 DeAngelis appeared for the deposition at which he asserted his Fifth Amendment privilege and refused to answer any questions posed concerning any of his assets. He also refused to answer any questions concerning the statements he made in the four affidavits presented to the court in this case.

The State moved pursuant to *R.* 4:23–1(a) to compel DeAngelis to provide full and complete answers to questions concerning his assets posed at the deposition as well as any other questions that might be posed in the future regarding those assets and to compel DeAngelis to provide counsel for plaintiffs with an accounting listing his assets. The State also moved for an order requiring DeAngelis to provide plaintiffs with a financial statement, prepared and certified by a certified public accountant, for each month from January 1, 1984 to the present.

The State's request for relief was premised on the fact that DeAngelis had filed four sworn statements in this action pertaining to his assets in response to motions seeking a freeze of those assets and an appointment of a receiver. Through such

filings, plaintiffs maintained DeAngelis had waived any privilege he may have had as to disclosure of details relating to those areas of his testimony. The State also argued that DeAngelis' blanket assertion of the privilege as to all questions was improper and that the burden of showing that questions posed were incriminating was on him.

The Bureau's motion to compel discovery and to require DeAngelis to answer questions regarding his assets and to supply an accounting was originally scheduled to be heard before Judge Skillman. On the return date of the motion, the judge expressed doubt regarding the State's waiver argument Nevertheless, he afforded the State an opportunity to further brief the matter, but advised the State that it had the burden to demonstrate waiver to the Court.

In the interim, Judge Skillman was assigned to this court and Judge Bachman, was assigned to this matter. Following argument on March 14, 1986 Judge Bachman ruled that DeAngelis had waived his Fifth Amendment privilege regarding his assets as a result of his filing the four affidavits. In rendering his decision, he took into consideration what he deemed to be the court's obligation "to preserve whatever assets are out there belonging to Mr. DeAngelis, so that should liability be imposed against him ... there would be something from which many alleged victims could be satisfied."

Judge Bachman further said that, although he understood that a defendant may give a statement in a pre-trial proceeding and later claim the privilege at trial or another stage of the proceedings, he viewed the submission of affidavits relating to DeAngelis' assets to constitute one continuous proceeding, and that the discovery deposition was in the nature of cross-examination. Thus, he determined that this was analogous to a situation where a defendant takes the stand, gives his version of the case and refuses to answer questions on cross-examination and was a waiver.

In reaching his decision he sought to balance DeAngelis' Fifth Amendment privilege against the rights of investor claimants in the Bureau's case who had allegedly been defrauded.

Now, the third part of my thinking is this: We're dealing here with legislation which is meant to protect innocent victims from shady practices in the stock broking business, and it is public legislation with a public purpose, and to make that legislation effective there has to be an attempt made by the Court to preserve the corpus, and the rights of the citizens have to be balanced against the Fifth Amendment rights. And I think weighing it that we there is a great policy need to protect the victims.

The judge not only ruled that DeAngelis had waived his privilege with respect to the matters raised in his affidavits, but with respect to any questions regarding assets "which he had, which he has, now or which he had at the time." The taking of DeAngelis' depositions was stayed by the judge pending the outcome of this appeal.

The privilege against self-incrimination may be waived by a party in a civil action "who voluntarily testifies in the action upon the merits." *Evid. R.* 25(d); *N.J.S.A.* 2A:84A–19. That party "does not have the privilege to refuse to disclose in that action any matter relevant to any issue therein." The Fifth Amendment privilege is rooted in our New Jersey common law, is now statutory in this State, and has been incorporated into the Fourteenth Amendment. *See Malloy v. Hogan,* 378 *U.S.* 1, 84 *S.Ct.* 1489, 12 *L.Ed.*2d 653 (1964); *N.J. Rules of Evidence* Anno. 1986, Comments 1 and 6 to *Evid. R.* 25, and *Merck & Co., Inc. v. Biorganic Laboratories, Inc.,* 87 *N.J.Super.* 23 (Ch. Div. 1965).

The issue before us is neatly posed in *McCormick, Evidence* § 140 at 345 (3rd ed. 1984)—"after a witness has revealed a certain amount of information, requiring him to make further disclosure may not significantly endanger the interests which the privilege protects. When, however, does the witness reach the point at which he may no longer invoke the privilege?" The leading case is *Rogers v. United States,* 340 *U.S.* 367, 71 *S.Ct.* 438, 95 *L.Ed.* 344 (1951), which *McCormick* describes as follows

... [P]etitioner had testified before a grand jury to having held the office of Treasurer of the Communist Party and to having had possession of its membership lists and books until January of 1948, at which time she turned them over to another. When asked the identity of the person to whom she turned them over, she declined to answer. Affirming a sentence for contempt, the Supreme Court found that in view of her prior testimony, petitioner was not justified in declining to reveal the name of the person to whom the documents had been given, relying upon the well-accepted rule that where incriminating facts have been revealed without claiming the privilege, the privilege cannot be invoked to avoid disclosure of the details. [*McCormick*, § 140 at 345].

*McCormick* concludes that the loss of the privilege "under *Rogers* is not based on waiver principles;" the traditional "knowing and intelligent" test need not be met. *Ibid.*

*McCormick* summarizes the perceived animating rationale of *Rogers* as follows

... [I]t is uncertain the extent to which *Rogers* is merely an application of the general requirement that a demanded answer be incriminating. The Court observed that in regard to each question as to which Rogers invoked her privilege, the court must consider her prior testimony and determine "whether the answer to that particular question would subject the witness to a 'real danger' of further crimination." Rogers' contempt commitment was upheld because the Court found the question at issue would not increase her danger of prosecution and conviction. This, of course, provides a satisfactory rationale for the *Rogers* result that require recourse to neither waiver considerations nor the danger of distortion presented by any particular facts. It further provides the basis for a criterion for applying *Rogers* to additional situations. Most courts appear to have relied exclusively on this rationale and have asked in such situations whether responding to the question asked would, given the witness' prior testimony, increase the risk of incrimination. Only if the answer is negative has the witness lost the right to claim the privilege.

Following this view of *Rogers* and the generally liberalized approach of the Supreme Court towards the privilege, lower courts have found relatively few situations in which a witness may be compelled to continue with his testimony. [*Id.* at 346–347].

*See also* VIII *Wigmore, Evidence*, § 2276 at 456 (1961 and Supp.1986), stating that "[t]he application of the rule comes to depend chiefly on the relations of the particular facts inquired about and the extent to which the particular witness has gone in prior testimony." *Id.* at 458, at n. 2.

*Brown v. United States*, 356 *U.S.* 148, 78 S.Ct. 622, 2 *L.Ed.*2d 589 (1958), gives us additional thoughts on the subject. Appellant was found guilty of criminal contempt after refusing to

answer certain questions put by the government's attorney on cross-examination in a denaturalization proceeding under the Immigrations and Nationality Act of 1952, 66 *Stat.* 260, 8 *U.S.C.* § 1451(a). Brown had voluntarily testified on direct but wanted to draw the line against self-incrimination once her cross-examination began. Speaking for a 5–3 majority, Justice Frankfurter said that Brown must answer questions relevant to her direct testimony. The Justice observed that: "Our problem is illumined by the situation of a defendant in a criminal case. If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." *Id.* at 154–155, 78 *S.Ct.* at 626–27. This reasoning "applies to a witness in any proceeding who voluntarily take the stand and offers testimony in his own behalf." *Id.* at 155, 78 *S.Ct.* at 627. The rule was also expressed this way: "Petitioner, as a party to the suit was a voluntary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination." *Id.* at 156, 78 *S.Ct.* at 627. In conclusion Justice Frankfurter said that the "District Court conveyed a correct statement of the law, and adequately informed petitioner that by her direct testimony she had opened herself to cross-examination on the matters relevantly raised by that testimony." *Id.* at 157, 78 S.Ct. at 628.

As Chief Justice Vinson observed in *Rogers*, 340 *U.S.* at 371, 71 *S.Ct.* at 440–41, "to uphold a claim of privilege in this case would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony" and further that "disclosure of a fact waives the privilege as to details." *Id.* at 373, 71 *S.Ct.* at 442.

We adopt the principles expressed by these authorities but recognize that precise application may be difficult in concrete situations. Where the question of waiver is a close one we remind the trial courts of the dictum of Justice Weintraub in

*State v. DeCola*, 33 *N.J.* 335, 346 (1960), when he said that where "[T]he clash is between the basic values we have discussed, [*i.e.*, disclosure of truth or the protection of the privilege]. Which should prevail? Judicial decisions are virtually unanimous in favor of the witness' privilege." [Citations omitted]. *See also In re Pillo*, 11 *N.J.* 8, 19 (1952) (Brennan, J.). The duty of DeAngelis to answer the questions put to him on depositions will be measured by the extent of his prior voluntary disclosures in the four certifications he advanced to defeat the State's claims for interim relief in this civil regulatory proceeding.

■ We also reject DeAngelis' contention that he be completely relieved of the duty to testify because his efforts by these certifications failed in the most part to blunt the State's efforts to secure interim relief against him. He seems to argue that because his certifications failed to convince Judge Skillman, he has no duty to submit to interrogation about them. This contention is not sensible or realistic. If permitted, a party could make extravagant unexamined claims in *ex parte* affidavits and if unsuccessful then withdraw behind the privilege without fear of the test of cross-examination. This would not encourage the truth-seeking process. We will not so overindulge the privilege where appellant has been counseled from the inception of this matter, has offered his sworn assertions voluntarily in his economic self-interest, and had good reason to suspect possible criminal investigation and charges eventually from the matter. Nor do we consider this case, where the testimony is by affidavits resisting interim relief, any different than one of live testimony in open court or before an administrative tribunal.

The judgment of the Law Division is modified to conform to the expressions of law in this opinion, and as modified, is affirmed.