894 A.2d 83 (2006)
384 N.J. Super. 154
George ATTOR, Plaintiff-Appellant,
v.
Lucy ATTOR, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 9, 2006.
Decided March 24, 2006.
*85 Francis Obi, Irvington, attorney for appellant.
Theodore Campbell, attorney for respondent.
Before Judges PARRILLO, HOLSTON, JR. and GILROY.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
Plaintiff, George Attor, appeals the April 2, 2004 Family Part order granting him and defendant, Lucy Attor, a dual judgment of divorce and dismissing his claim for an annulment. In doing so, the judge credited defendant's testimony as to the validity of the parties' marriage, even though during defendant's testimony the judge suggested and then allowed defendant to assert her Fifth Amendment privilege against self incrimination, thereby permitting her to avoid meaningful cross-examination by plaintiff on the subject of the validity of the marriage.
We hold that the judge erred in permitting defendant to assert her Fifth Amendment privilege against self incrimination, because her testimony was also being given in support of her counterclaim for divorce. Defendant, by testifying, waived any protection afforded by the privilege. Additionally, defendant failed to show that she faced potential criminal prosecution based on her testimony. Accordingly, we remand the matter for further factfinding in accordance with this opinion.
Plaintiff filed a complaint for divorce from defendant on March 7, 2001, on the ground of extreme cruelty. On June 4, 2001, defendant entered her appearance on the issues of alimony, support, division of property, counsel fees and costs. On July 31, 2001, defendant filed an answer and counterclaim requesting a divorce from plaintiff on the ground of extreme cruelty. The counterclaim additionally sought alimony, support, equitable distribution of assets and counsel fees. On July 19, 2002, plaintiff filed a motion to amend his divorce complaint to include a count for annulment.[1]
Following an eight-day trial, the judge, on April 2, 2004, entered a thirty-six page written decision and order denying plaintiff's claim for an annulment and granting a dual judgment of divorce. The judge also awarded equitable distribution and rehabilitative alimony to defendant.[2]
There is very little the parties agreed upon concerning the origin of their marriage. Plaintiff's version was as follows. *86 Prior to marrying defendant, plaintiff had been married to Yvonne Livingston on September 16, 1980, and was divorced from her on August 8, 1990. Although plaintiff claims he knew defendant since 1975 when he resided in Ghana, he had not re-established contact with defendant until 1991, after his divorce from his first wife. Plaintiff testified that he entered into a marriage ceremony with defendant in Ghana after he was informed by defendant that her first husband had died. A traditional tribal marriage ceremony with defendant's family was performed. The ceremony was then registered at the government registry on October 1, 1991, in Ghana's capital city of Accra. Shortly after the marriage ceremony, Plaintiff returned to the United States with the intention of bringing defendant, along with her daughter, Heartwill, and son, Franklin, to the United States.
Plaintiff was informed by an immigration attorney in the United States that the October 1, 1991 registration of the traditional tribal ceremony did not constitute a legal marriage. Upon this advice, plaintiff returned to Ghana and entered into another marriage ceremony with defendant on October 1, 1994. Based upon the second marriage ceremony, defendant and her two children were permitted to emigrate from Ghana to the United States in 1995. The U.S. immigration process involved an interview with the Consular Officer of the United States in Accra, during which defendant presented various documentation including a death certificate for a person she represented as being her former husband, Emmanuel Mensah, and school documents for her children.
Plaintiff further testified that after their separation in 2000 and during the period in which the divorce proceedings were pending, he learned that the death certificate presented by defendant during the immigration process was not genuine, and that her prior husband with a surname of Sosu is still alive and residing in Europe. As a result, plaintiff filed the motion to amend his complaint to include a count for annulment.
Defendant's account differed greatly. Defendant's version was as follows. Prior to her marriage to plaintiff, defendant had been married to Isaac Sosu in 1980 in a customary tribal marriage, and they were divorced in a customary tribal divorce in February 1983. She had one daughter with Sosu named Heartwill, and she believes Sosu currently resides in Switzerland. Defendant further testified that she and plaintiff were married in a customary tribal ceremony in July 1988 in Ghana. Plaintiff returned to the United States three weeks after their marriage, and plaintiff rented a home for her in Ghana while he remained in the United States. Defendant testified that they were married again in a formal civil ceremony on October 1, 1991, and when planning to emigrate from Ghana to the United States, plaintiff's brother, Mensah Attor, changed her daughter's last name to Mensah. Defendant also testified that it was plaintiff who gave her a false death certificate bearing the name Emmanuel Mensah, for the purpose of claiming that Franklin, plaintiff's nephew, was defendant's son so that she could bring him into the United States. Defendant further testified that it was plaintiff who prepared her for the interview with immigration officials.
On April 16, 2003, defendant was called as a witness by plaintiff's counsel to give testimony on plaintiff's claim for annulment. The judge interrupted defendant's direct examination in order to instruct defendant's counsel to explain to defendant her Fifth Amendment rights. The judge stated, "Do you want to advise her as to her rights under the Fifth Amendment, *87 et cetera?" This exchange took place after defendant began to testify as to her representations to U.S. Embassy officials in Ghana on her visa application regarding the children.
Plaintiff's counsel asked defendant: "When you appeared at the American Embassy, did you provide false statements to the consular officer in your interview?" Immediately following this question, defendant's counsel replied to the judge:
Your honor, before we proceed with regard to counsel's line of questioning just prior to the break, it is my intent to advise my client not to answer any more questions with regard to her application or George Attor's application as the spouse for her to come to this country and the information that was put on the application. Okay? On the grounds that it may incriminate her in some criminal charge.
Amid the judge's effort to translate Fifth Amendment rights to defendant, plaintiff's counsel interjected,
Your honor, I'm raising my objection to counsel's assertion of the Fifth Amendment for his client to preclude her from testifying to questions and answers she provided to the consular officer at the American embassy because it's my belief that she has waived any Fifth Amendment protection by her answering questions in that area.
Plaintiff's counsel's next question to defendant was, "Ms. Attor, so you know who an Emmanuel Mensah is? Emmanuel Mensah?" Defendant's only reply was that she wasn't going to answer. Counsel explained to the judge that he was asking about Emmanuel Mensah because he "is the individual that, on the death certificate his name appears asthat's because supposedly [defendant] is a widow, [of] the person who died on the death certificate." A series of related questions followed, all of which defendant declined to answer, asserting the Fifth Amendment.
The ability to fully examine the defendant was particularly important in this case given that within the judge's thirty-six page written opinion denying plaintiff's request for an annulment and granting divorce, the judge found that the plaintiff provided no evidence to support his claim that the defendant fraudulently induced him to marry her. The judge decided credibility in favor of defendant, accepting as true defendant's untested version that plaintiff created a false death certificate for a fictional husband named Emmanuel Mensah so that she could immigrate to the United States.
In denying plaintiff's claim for an annulment, the judge concluded that plaintiff had failed to carry his burden of establishing by clear and convincing evidence: (1) fraud in the essentials of the marriage, and (2) that he had not subsequently ratified the marriage. The judge determined that plaintiff failed to substantiate his claim that defendant was married and not widowed at the time she married him.
The judge directed that Ghana immigration officials review and authenticate the various documents of the parties. Plaintiff contends that a copy of the 1994 marriage certificate that he presented proved that defendant was lying in her testimony about the tribal ceremony marriage of 1988 and the formal ceremony in 1991. However, the judge received written advice from the Consular General of Ghana that the 1994 marriage certificate was not authentic, and that the 1991 marriage certificate presented by defendant was valid.
The judge made the following findings in denying plaintiff's count for an annulment of the marriage.
The New Jersey Courts have held that where a marriage has been consummated, *88 the fraud alleged must be of an extreme nature, that goes to one of the essentials of marriage. V.J.S. v. M.J.B., 249 N.J.Super. 318 [592 A.2d 328] (Ch. Div.1991). The courts have also held that nondisclosure of a prior marriage and divorce does not qualify as an extreme enough fraud to annul a marriage. Gerard v. Distefano, 84 N.J.Super. 396 [202 A.2d 220] (Ch.Div.1964).
New Jersey law further held that there is a strong presumption in favor of the latter of two successive marriages involving a common participant, and the presumption is that the first marriage was terminated by death, divorce, or annulment before the party entered into the second marriage. Prater v. AFTRA Health Fund, 23 F.Supp.2d 505 (D.N.J. 1998). In order to rebut the presumption, the burden is on the challenging party to prove by clear and convincing evidence that the first marriage was not terminated and the parties were, at the time of the marriage, free from disabilities against a lawful marriage. Id. The New Jersey courts have even held that the petitioner, in order to get an annulment based upon his wife's incapacity to enter into marriage, had the burden to show by a preponderance of the evidence proof of his wife's previous marriage, the fact that her previous husband was still alive, that she and her previous husband were never divorced, and the petitioner was unaware of the facts when he entered into the marriage. Tyll v. Keller, 94 N.J. Eq. 426 [120 A. 6] (E. & A.1923).
In his written opinion, the judge made the following findings of fact: (1) The parties were married in a civil ceremony in Ghana on October 1, 1991; (2) Defendant had been married to Isaac Sosu in a tribal ceremony in 1980, and she divorced him in a tribal ceremony in 1983; (3) Defendant has one daughter, Heartwill Mensah; (4) Defendant and her daughter came to the United States in 1995 to live with plaintiff; (5) Plaintiff purchased the marital residence in 1994 with the intent that the parties reside there during their marriage; and (6) The parties separated on December 15, 2000.
The judge was unable to determine the true identity of Emmanuel Mensah. The death certificate for Mensah entered into evidence was attached to a letter from the Consular General of Ghana, which stated that the document did not come from their registry and was instead a fraudulent document. Therefore, the judge concluded that while it cannot be determined who exactly Emmanuel Mensah was, or whether he was deceased, the death certificate submitted as part of the immigration process clearly was not valid. The judge also concluded that he could not make a finding as to the true identity of Franklin Mensah, the boy accompanying defendant and Heartwill to the United States.
Plaintiff presents the following arguments for our consideration:
POINT I
THE TRIAL COURT ERRED BY ALLOWING THE DEFENDANT TO USE THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION AS BOTH A SWORD AND A SHIELD WITHOUT DRAWING A NEGATIVE INFERENCE AGAINST THE DEFENDANT.
POINT II
THE TRIAL COURT MISUNDERSTOOD THE FACTS OF THE CASE AND CONSEQUENTLY REACHED AN UNJUST RESULT.
POINT III
COULD A COURT ACCEPT AN AFFIDAVIT SWORN IN A FOREIGN COUNTRY DESPITE THE RULES *89 AGAINST THE ADMISSIBILITY OF HEARSAY STATEMENT.
POINT IV
COULD A WRONG DOER (PERJURER AND BIGAMIST) BE ENTITLED TO EQUITABLE DISTRIBUTION.
POINT V
Could a document containing an affirmation made by a declarant lacking knowledge be admissible to prove the occurrence of the event.
Plaintiff argues that the judge should not have permitted defendant to invoke her Fifth Amendment privilege against self-incrimination after she began to give testimony concerning the presentation of certain documents to immigration officials, because by doing so, defendant prevented further examination on her assertions. Plaintiff contends that the judge also erred by not drawing an adverse inference against defendant when she refused to answer questions by claiming her right against self-incrimination.
The propriety of the judge's statements to defendant's counsel regarding assertion of the Fifth Amendment privilege, although not directly addressed by plaintiff on appeal, warrants discussion. Although arising in a criminal rather than civil context, the Supreme Court made clear in State v. Buonadonna, 122 N.J. 22, 583 A.2d 747 (1991), that
courts should not intrude too greatly into the attorney-client relationship, even if that intrusion is solely to ensure that defendants have waived their rights knowingly and voluntarily. "Under our adversary system, ... the vast array of trial decisions, strategic and tactical, which must be made before and during the trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system."
[Id. at 38 [583 A.2d 747] (quoting Estelle v. Williams, 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126, 135 (1976)).]
This court in State v. Bogus, 223 N.J.Super. 409, 538 A.2d 1278 (App.Div.), certif. denied, 111 N.J. 567, 546 A.2d 497 (1988), also stated: "[F]or a trial court to discuss the issue [of the privilege against self-incrimination] directly with a defendant represented by counsel may inappropriately involve the trial court in the unique attorney-client relationship, raising possible Sixth Amendment as well as Fifth Amendment concerns." Id. at 423-24, 538 A.2d 1278.
The judge is not barred from alerting the witness of her self-incrimination right, but the judge's authority to caution the witness should be exercised sparingly and with caution. To the extent that evidence is suppressed through assertion of the privilege, "justice is denied because the truth has been suppressed. To justify so serious an insult to the judicial process, some compensating gain should be incontestable." State v. Johnson, 223 N.J.Super. 122, 132, 538 A.2d 388 (App. Div.1988), certif. denied, 115 N.J. 75, 556 A.2d 1218 (1989).
Prior to the judge's direction to defendant's counsel that he should discuss with his client the assertion of her Fifth Amendment privilege, defendant had taken the stand voluntarily to answer questions on direct examination. Although she had been called as a witness on plaintiff's direct case, she was at all times affirmatively asserting her claim for divorce as pled in her counterclaim.
N.J.R.E. 503(d) in applicable part states: "subject to the same limitations on evidence affecting credibility as apply to any other witness, ... a party in a civil action who voluntarily testifies in the action upon the merits does not have the privilege to *90 refuse to disclose in that action, any matter relevant to any issue therein." The comment to N.J.R.E. 503(d) states that the practical result of a party's decision to testify is to waive the privilege, at least so far as to permit effective cross-examination. See Biunno, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 503(d) (2005).
Our Supreme Court has determined that even in a criminal context, "voluntary testimony by the accused at ... trial prevents him or her from later asserting the privilege against self-incrimination concerning any matter relevant to any issue in the case." Buonadonna, supra, 122 N.J. at 37, 583 A.2d 747. Here, defendant was essentially permitted by the judge to selectively testify as to what she chose, while at the same time avoiding any questions she did not wish to answer.
Defendant contends that Mahne v. Mahne, 66 N.J. 53, 328 A.2d 225 (1974) applies because when she first asserted the privilege she was not testifying in support of her counterclaim but had been called as a witness by plaintiff on his direct claim for an annulment. We disagree. The Court in Mahne discussed the appropriate sanction to be imposed by a court when the defendant, in a divorce action by her husband alleging adultery, asserted her Fifth Amendment right against self incrimination when asked in an interrogatory whether she had ever had sexual relations with the co-defendant. At that time New Jersey's criminal statutes declared that adultery and fornication were misdemeanors. Id. at 55, 328 A.2d 225. The Court, citing Steinbrecher v. Wapnick, 24 N.Y.2d 354, 300 N.Y.S.2d 555, 248 N.E.2d 419 (1969), stated:
[W]here the civil plaintiff, who is in court voluntarily, invokes his privilege at examination before trial he is unfairly depriving the defendant of "information necessary to his defense" and consequently he may in the court's discretion be subjected to a sanction as severe as dismissal. On the other hand [when] the civil defendant is in court involuntarily,... when called for pretrial examination he has "no choice but to appear and face questions chosen by his opponent solely for the latter's benefit."
[Mahne, supra, 66 N.J. at 60, 328 A.2d 225 (citations omitted).]
The Court concluded that while the striking of the defendant's answer would be unduly harsh since she was in court involuntarily, the trial court may readily draw an adverse inference. Ibid.
In State v. Kobrin Securities, Inc., 213 N.J.Super. 161, 169, 516 A.2d 1130 (App. Div.1986), rev'd on other grounds, 111 N.J. 307, 544 A.2d 833 (1988), we held that "[T]he privilege against self-incrimination may be waived by a party in a civil action `who voluntarily testifies in the action upon the merits.'" (citations omitted). In this case, plaintiff originally filed a complaint for divorce against defendant. However, defendant chose to file not only an answer to plaintiff's complaint but to also file a counterclaim for divorce, seeking dissolution of the marriage and both equitable distribution of property and monetary support. Therefore, defendant was not testifying involuntarily because she was affirmatively seeking relief before the court.
We are also convinced that defendant improperly asserted the privilege here because there was no reasonable basis for the exercise of the privilege. In Kobrin Securities, Inc., we determined that the witness "`[did] not have the privilege to refuse to disclose in that action any matter relevant to any issue therein.'" Ibid.
We stated that
A witness can only refuse to answer a question which will incriminate him, and *91 his mere declaration that his answer to a particular question may tend to incriminate him is not dispositive. The witness must support the invocation of the privilege by testimony indicating the nature or area of the criminal exposure which he fears.
....
[I]n evaluating the witness' answer the judge must determine whether the witness has a reasonable basis on which to fear prosecution. The danger must be "real and appreciable," rather than of an "imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency."
[In the Matter of Ippolito, 145 N.J.Super. 262, 266-67, 367 A.2d 883 (App.Div. 1976) (quoting In re Pillo, 11 N.J. 8, 19, 93 A.2d 176 (195[2])), rev'd on other grounds, 75 N.J. 435, 383 A.2d 117 (1978) (citation omitted).]
The Fifth Amendment's privilege against self-incrimination protects two distinct rights for testifying individuals:
The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.
[Bogus, supra, 223 N.J.Super. at 421, 538 A.2d 1278 (citation omitted).]
"On the other hand, if a [witness'] testimony cannot incriminate her, she cannot claim a Fifth Amendment privilege." United States v. Mitchell, 122 F.3d 185, 189 (3d Cir.1997) (citing Ullmann v. United States, 350 U.S. 422, 431, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956)) ("if the criminality has already been taken away, the amendment ceases to apply" (internal quotations omitted)), rev'd on other grounds, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999). Such is the case here, as defendant's testimony pertaining to her immigration could not have incriminated her at the time of trial. United States v. Brooks, 284 F. 908 (E.D.Mich.1922).
In Brooks, the court explained the purpose of the Fifth Amendment as:
to secure a witness from the danger of a criminal prosecution against him which may be aided by his forced disclosures, and not to enable such witness to withhold testimony merely because it might tend to subject him to the results of a civil action, or to some other injury not arising from a criminal prosecution. A deportation proceeding is not criminal, but civil, in its nature, and consequently an alien may not refuse to answer questions properly asked by an immigration inspector designed to ascertain whether such alien is subject to deportation, when such refusal is based upon the sole ground that his answers to such questions will be incriminating evidence against himself, because they may result in his deportation.

[Id. at 909-10 (emphasis added) (citations omitted).]
The Ninth Circuit similarly held in United States v. Mendez-Argueta, 59 Fed. Appx. 956, 959 (9th. Cir.2003), that "[t]he government ... acknowledges that an administrative determination of alienage in a deportation or removal order is insufficient, standing alone, to establish alienage in the criminal context." "An individual's refusal to testify during a deportation proceeding `may form the basis of inferences against him in the deportation proceeding.'" Ibid. (citations omitted). The court concluded, "The inference from silence is justified by the distinction between civil deportation proceedings and criminal trials." Ibid. Also, in Cabral-Avila v. Immigration *92 and Naturalization Service, 589 F.2d 957, 959 (9th. Cir.1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1245, 59 L.Ed.2d 472 (1979), the court held "The deportation proceeding, despite the severe consequences, has consistently been classified as a civil, rather than a criminal matter."
In addition to relevant case law, the Immigration and Naturalization Act (INA) § 504(g), describes the burden of proof in removal hearings as indicative of a civil action, requiring the government to prove "by the preponderance of the evidence," rather than "beyond a reasonable doubt." INA § 274C further describes penalties associated with violating the immigration laws as "civil" penalties. This distinction between criminal and civil proceedings is critical because defendant, in order to properly assert her Fifth Amendment privilege, must have been fearful of subjecting herself to criminal, and not merely civil, punishment. Because deportation hearings are considered civil proceedings rather than criminal, we are convinced that defendant could not properly assert her privilege at this divorce trial to avoid civil consequences from her actions before the Immigration and Naturalization Service (INS) in connection with her immigration to the United States.
In addition to arguing that she could have been subjecting herself to possible deportation hearings, defendant might also have asserted that she was at risk of incriminating herself for potential prosecution for the crime of false swearing, specifically with regards to the death certificate and school documents presented to immigration officials. However, defendant's fear of such prosecution would not be a valid basis for asserting her Fifth Amendment privilege because the statute of limitations for prosecution of this crime had already run. Defendant entered the United States in 1995, and at that time she could have been exposed to prosecution for falsifying her immigration papers. However, the plenary hearing for divorce/annulment took place in April 2003, over two years after the five-year statute of limitations for false swearing had run. Pursuant to 18 U.S.C.A. § 3282, all non-capital federal offenses must be prosecuted within five years. Falsifying immigration documents is a federal crime punishable by a fine and up to five years in prison. See 18 U.S.C.A. § 1001. Thus, the five-year statute of limitations would have barred prosecution at the time of the divorce/annulment hearing. This court's concurring opinion in B. and H.S. Corp. v. Holly, 198 N.J.Super. 83, 90, 486 A.2d 862 (App.Div.1984), certif. denied, 101 N.J. 255, 501 A.2d 925 (1985), stated, "If the prosecution of the criminal event in which the witness fears his testimony will incriminate him is barred by the statute of limitations, the privilege has been held not to apply."
We are satisfied that the privilege against self-incrimination was invoked under improper circumstances in this case. The trial judge should have instead compelled defendant to testify rather than have instructed her counsel to the contrary. Because defendant's testimony was, in effect, in support of her counterclaim for divorce, her testimony constituted a waiver of any Fifth Amendment privilege. If her assertion of the privilege was due to a fear of deportation, it was wrongly asserted because deportation proceedings are considered civil rather than criminal in nature. If the assertion were due to a fear of prosecution for false swearing, such prosecution was time barred. Had defendant been compelled to testify, plaintiff's counsel would have had the opportunity to test the veracity of defendant's testimony, which went to the essence of the issues before the court.
*93 If defendant, after being instructed to testify by the court, had continued to refuse to testify on Fifth Amendment grounds, the court should then either have drawn an adverse inference against defendant or struck her testimony concerning her interview with immigration officials and the receipt of a false death certificate from plaintiff. See Mahne, supra, 66 N.J. at 60, 328 A.2d 225.
Not only did the questions that defendant refused to answer go to the heart of the issues in this case, i.e., whether an annulment or divorce should be granted, opportunities by plaintiff's counsel to explore defendant's credibility were also thwarted. The parties in this case gave conflicting versions of pivotal events that should have been explored fully at trial. The judge should have compelled defendant to answer plaintiff's counsel's questions exploring issues that went to the essence of the conflicting claims before the court, including whether defendant's former husband was, in fact, Emanuel Mensah, the man whose allegedly false death certificate was provided to the immigration authorities or whether defendant's former husband was Sosu and whether she and Sosu and or Mensah were, in fact, divorced through a tribal customary divorce.
By limiting her testimony through the assertion of the Fifth Amendment privilege, defendant was able to avoid questions that might have undermined her credibility and her version of the facts. She was permitted to have her testimony concerning plaintiff's involvement in her attempt to immigrate to the United States by the use of false documents considered by the judge, without her testimony being subject to challenge.[3]
We are cognizant of the Supreme Court's decision in Heuer v. Heuer, 152 N.J. 226, 704 A.2d 913 (1998), and its potential applicability to the facts in this case. In Heuer, the Court affirmed its holding in Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982), and held that under the doctrine of quasi-estoppel and based on the totality of the circumstances the husband was estopped from attacking the validity of his marriage based on the invalidity of his wife's prior divorce. Heuer, supra, 152 N.J. at 229, 234-35, 237, 704 A.2d 913. In Heuer, the wife had been married twice before, her first marriage ended by means of a "quickie" divorce proceeding that took place in Alabama. Id. at 230, 704 A.2d 913. Unknown to the wife, her second husband, or her current husband, the Alabama divorce decree was not valid. Id. at 233, 704 A.2d 913. However, the Court decided that the husband was not entitled to use this invalid decree to his advantage in an attempt to avoid paying alimony and related support. Id. at 231, 704 A.2d 913.
In discussing the presumptions that arise when dealing with two or more marriages, the Court stated:
irrespective of the factual context in which the issue may arise, the last of two or more marriages is presumptively valid. The presumption of validity may be overcome only by clear and convincing evidence that (1) there was a prior marriage, (2) the prior marriage was valid, and (3) the prior marriage was not terminated by death or divorce before the latest marriage.

*94 [Id. at 234, 704 A.2d 913 (quoting Newburgh, supra, 88 N.J. at 538, 443 A.2d 1031).]
Here, however, the evidence of defendant's prior marriage and divorce stem from only one source, sworn affiants, as neither the marriage nor divorce had been recorded publicly. Although after defendant immigrated to the United States, both parties held themselves out to the public as husband and wife, plaintiff contends that he did not learn of defendant's alleged fraud in the inducement of marriage until after the parties were separated and the divorce complaint was filed.
Because we are convinced that the judge erred in permitting defendant to assert her Fifth Amendment right and, therefore, precluded plaintiff's effective examination of defendant and because defendant's testimony was critical to the court's determination, which accepted essentially the direct examination of defendant, we remand the matter for further proceedings. Plaintiff's counsel must be given an opportunity to re-examine defendant on the immigration proceedings and properly explore the veracity of her allegations that plaintiff falsified a death certificate in order to bring her into the country, her father's name and certification concerning defendant's tribal divorce and Heartwill's school records. After a limited re-hearing, the judge must make further findings of fact and determine whether his original judgment should stand or whether a different result should be determined. We do not retain jurisdiction.[4]
Remanded.
NOTES
[1] It is unclear from the record whether the motion to amend was granted but the judge in his written decision determined that two of the issues to be decided by him were: (1) whether the parties were legally married and (2) whether an annulment, based upon fraud, or a divorce should be granted.
[2] The judge's award of equitable distribution and rehabilitative alimony are not issues on appeal.
[3] Defendant again asserted her Fifth Amendment privilege when asked about the name of her father, Johannes Mensah Klutsey, whose certification concerning the tribal customary divorce was a basis for proving the divorce. She was also able to avoid answering questions concerning her daughter Heartwill's school records on Fifth Amendment privilege grounds.
[4] We do not in this opinion specifically address Points II, III, IV and V. We are satisfied that plaintiff's arguments with respect to those points are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(A) and (E).