# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2103-19T1

M.L.S.[1],

     Plaintiff-Appellant,

v.

J.S.S.

     Defendant-Respondent.

_____

Argued December 15, 2020 – Decided January 7, 2021

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-0708-20.

Howard B. Felcher argued the cause for appellant (Law Offices of Howard B. Felcher, PLLC, attorneys; Howard B. Felcher, on the briefs).

Brian C. Martel argued the cause for respondent (Shapiro, Croland, Reiser, Apfel & DiIorio, LLP, attorneys; Brian C. Martel and Aislinn M. Koch, on the brief).

---

[1] We use initials to protect the parties' privacy. R. 1:38-3(d).

PER CURIAM

Plaintiff M.L.S. appeals from a December 16, 2019 order dismissing a complaint she filed against defendant J.S.S. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

The domestic violence matter arose in the midst of the parties' long, contentious divorce. Plaintiff commenced the divorce action in 2015 and the parties have lived separately since then. In the matrimonial proceeding, defendant filed several enforcement motions against plaintiff to compel her to pay support, which the court granted and enforced via a bench warrant. On October 10, 2019, one day prior to the return date of an enforcement motion, plaintiff filed her domestic violence complaint and obtained a temporary restraining order (TRO).

The complaint alleged defendant stalked plaintiff because she discovered he "hired a company named [Spytech] and . . . discovered that def[endant] had been tracking [her]." The complaint asserted plaintiff discovered a tracking device on her car in May 2019 and "learned from a [third] party that def[endant]

stated he had [plaintiff] followed."[2]  As for the history of domestic violence, the complaint alleged "in 2015, def[endant] told plaintiff to stop her relationship with one of her friends and if not[,] he would physically hurt her friend."[3]  The complaint also alleged "def[endant] in anger blocked pl[aintiff] from leaving in 2015 by parking [in front of] pl[aintiff] for [fifteen] min[ute]s."  Plaintiff also alleged defendant "slammed kitchen cups violently in anger."

At the ensuing three-day trial, plaintiff testified and presented testimony by S.C., plaintiff's former employee and close friend; and a BMW service advisor who found the alleged tracking device on plaintiff's vehicle.  Plaintiff's counsel subpoenaed and called defendant to the stand.  However, because plaintiff filed a separate criminal action against defendant, he invoked his Fifth Amendment privilege and declined to testify.

S.C. testified she was in a Starbucks on January 9, 2019, when she saw defendant enter the store.  She observed defendant meeting with an unknown man, telling him "[s]he drives a late model BMW" and "the parking is under the building."  S.C. saw the unknown man take notes during the meeting and

---

[2]  The complaint alleged another predicate incident of domestic violence, but there was no testimony adduced and it is not part of this appeal.

[3]  The testimony at trial revealed the relationship was not romantic, but rather a spiritual one with a cleric.

believed the conversation was about plaintiff. S.C. testified the conversation made her believe plaintiff was in "immediate danger," and she contacted plaintiff the following day.

The service advisor testified plaintiff brought her BMW to his shop on May 30, 2019, claiming she had a damaged tire and that something was hanging down off the bumper. The shop replaced plaintiff's tire and removed a black box that was duct taped to the car. The service advisor testified that when he opened the box, he found a USB cable connected to a light switch, and it looked like "some kind of tracking device." He informed plaintiff about the box, and she called the police. When police arrived, they questioned the service advisor about the box and took the item as evidence.

Plaintiff testified she learned about Spytech because she saw three entries on defendant's February and March 2019 credit card statements, in the amount of $24.95 payable to STI. She claimed she performed a reverse telephone look up and determined the number on the credit card statements belonged to Spytech. Plaintiff learned the company offered monitoring and tracking services by visiting its website. She called the company and learned the only product offered for $24.95 was a tracking service.

Plaintiff testified to the history of domestic violence and claimed she was fearful of defendant. She explained since the day the device was found on her car, she spoke with police weekly and one such conversation, in October 2019, led her to believe she "was unsafe continuing the way it was going." Further, she "wanted to file a restraining order at that point, based on [the] information from the police." Plaintiff never elaborated on the conversation's substance.

The trial judge rendered a comprehensive oral decision. She found S.C.'s testimony was not credible because it "appeared somewhat contrived . . . [and] motivated by the fact that [plaintiff] has evidently been good to her and has an employment relationship with her, which she underplayed." She noted a photo S.C. took, which purported to be of defendant's meeting with the unknown man, was not persuasive because "one does not see . . . defendant's face." The judge further stated:

> I have great difficulty believing that in the middle of a busy Starbucks at 9:00 a.m. [S.C.] would have been able to hear such a conversation from some [fifteen] feet away, particularly when . . . defendant had his back to her. . . .
>
> Most importantly, if, in fact, [S.C.] heard this conversation, and told . . . plaintiff the very next day, why didn't . . . plaintiff do anything about it?

A-2103-19T1

The judge accepted the service advisor's testimony "that a box was found taped to the plaintiff's car," but it did not persuade her it "was a tracking device. Nor did it establish who taped this device to the car." The judge further noted neither the device nor a picture of it was offered in evidence.

The judge found plaintiff's testimony neither "credible [n]or convincing." She noted plaintiff did not seek a TRO until five months after finding the alleged tracking device. The judge stated: "[Plaintiff] claims [the delay] was because of what the police told her in late September early October, [however] . . . [s]he did not testify as to what she learned in that conversation that would ha[ve] prompted her to seek a [TRO] at that point."

The judge also found plaintiff did not link the charges discovered on defendant's credit card to the device on the vehicle. The judge found plaintiff's explanation regarding her investigation of the charges leading to her discovery of the payments to Spytech not credible because defendant received the statements in response to a subpoena, after plaintiff filed the domestic violence complaint.

The trial judge concluded the evidence did not support plaintiff's testimony that she feared defendant. The judge noted plaintiff never explained why she waited until October to file her complaint, despite learning about the

6

Starbucks meeting from S.C. in January and learning about the device affixed to her car in May. The judge stated:

> This is not a case in which . . . plaintiff is a dependent spouse living with . . . defendant and small children, feeling like she has no alternative. This is a case in which the parties separated almost four years ago. Plaintiff runs a substantial real estate business, investment business, is financially independent[,] and has grown[,] emancipated children. The parties have been in court on their divorce case on numerous occasions since plaintiff first learned of defendant's alleged stalking.
>
> . . . .
>
> Moreover, I found plaintiff's demeanor during the final hearing and throughout the divorce proceedings to be very revealing. At no time was her fear of . . . defendant evident.

The judge noted plaintiff never referenced the alleged domestic violence in the matrimonial "certifications she signed and filed with the [c]ourt between February and October[, . . . and] participated in an intensive all-day settlement conference in court on June 19th of this year and never expressed any discomfort or fear of . . . defendant when in the same room[.]"

The judge concluded the allegations of domestic violence were motivated by the adverse rulings in the matrimonial matter. The judge noted plaintiff was placed on a bench warrant status "just six days before . . . plaintiff took her

BMW to the shop, only to have the shop find the device on the car." The judge also noted defendant sought enforcement of litigant's rights throughout the summer. Plaintiff denied that her anger about defendant's enforcement efforts motivated her to file the domestic violence complaint. However, the judge rejected her testimony, finding "her testimony about not being sure what the consequence would be[] if she failed to comply with the [c]ourt's May . . . order to be disingenuous. In fact, at times it appeared to me that her confusion or lack of clarity was purposeful."

The judge concluded plaintiff's motive to file the domestic violence complaint, one day before the return date of defendant's enforcement motion seeking plaintiff's arrest for failing to comply with the May order, was to avoid paying the support or incarceration. The judge dismissed the complaint concluding plaintiff failed to "sustain her burden of establishing by a preponderance of the credible evidence that . . . defendant engaged in a predicate act of domestic violence, or that a [f]inal [r]estraining [o]rder [FRO] is necessary to protect her from immediate danger or further abuse."

Plaintiff raises the following points on appeal:

> I. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN FAILING TO RULE THAT DEFENDANT WAIVED HIS FIFTH AMENDMENT PRIVILEGE AGAINST SELF INCRIMINATION.

II. THE LOWER COURT ABUSED ITS DISCRETION IN DECLINING TO IMPOSE AN ADVERSE INFERENCE AGAINST DEFENDANT DUE TO HIS FAILURE TO TESTIFY.

III. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN APP[L]YING THE CLEAR AND CONVINCING EVIDENCE STANDARD INSTEAD OF THE PREPONDERANCE OF THE EVIDENCE STANDARD.

IV. THE LOWER COURT COMMITTED REVERSIBLE ERROR IN RENDERING A DECISION INCONSISTENT WITH THE FACTS.

V. THE LOWER COURT ABUSED ITS DISCRETION IN FAILING TO HOLD THAT PUBLIC POLICY DEMANDS THAT PLAINTIFF BE PROTECTED FROM FURTHER ACTS OF DOMESTIC VIOLENCE BY DEFENDANT.

The trial court's findings of fact are binding on appeal if "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). An appellate court may not set aside a trial court's factual findings unless convinced they "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Rova Farms, 65 N.J. at 484).

We defer to fact-finding by the Family Part because of its "special expertise in the field of domestic relations." Ibid. (citing Brennan v. Orban, 145 N.J. 282, 300-01 (1996)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). However, we owe no deference to the trial court's ruling on an issue of law, which we review de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We address Points I and II together, which concern defendant's invocation of his Fifth Amendment privilege against incrimination. Plaintiff argues the trial judge erred because defendant waived his Fifth Amendment privilege by adducing in evidence a certification from the matrimonial matter in which he "made numerous allegations . . . that [p]laintiff exhibited a pattern of behavior design[ed] to impose improper leverage on him . . . [including] the religious court, the parties' children, and the parties' religious and social community to influence [d]efendant to withdraw his contempt application against her." Plaintiff argues defendant used this certification to support his defense theory that she should be denied an FRO because she did not fear him. She argues defendant's actions not only show he waived his privilege against self-

incrimination, but required the judge draw an adverse inference against him for not testifying.

Pursuant to N.J.S.A. 2A:84A-19 and N.J.R.E. 503, a person has "a right to refuse to disclose in an action . . . any matter that will incriminate him or expose him to a penalty[.]"  However, an individual's privilege against self-incrimination may be waived where the individual voluntarily testifies regarding a matter falling under the privilege.  Attor v. Attor, 384 N.J. Super. 154, 166 (App. Div. 2006).

In a civil action, a judge may draw an adverse inference when a party invokes his or her Fifth Amendment right against self-incrimination.  State, Dep't of Law & Pub. Safety, Div. of Gaming Enf't v. Merlino, 216 N.J. Super. 579, 587 (App. Div. 1987).  But an adverse inference is only permitted where there is additional evidence to support an adverse finding.  Ibid.  The decision whether to draw an adverse inference is left to the discretion of the trial judge. Ibid.

We reject plaintiff's arguments.  The certification defendant proffered in evidence contained no admissions of domestic violence and instead contained his assertions that plaintiff was attempting an "end run" around the matrimonial court's enforcement of its pendente lite support order to pressure him to

capitulate in the divorce proceeding. The trial judge did not abuse her discretion by declining to draw an adverse inference for defendant's failure to testify in the domestic violence proceeding.

In Point III of her brief, plaintiff asserts the trial judge adjudicated the case using a clear and convincing standard rather than under a preponderance of the evidence. As we noted, the trial judge stated she "did not find [plaintiff's] testimony to be credible or convincing." This fleeting reference did not signal the judge had elevated plaintiff's burden of proof because in the following paragraph of the trial judge's decision she concluded plaintiff had not met the burden of proof by a preponderance of the evidence. This argument lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

In Points IV and V, plaintiff challenges the trial judge's findings of fact and conclusion plaintiff did not require the protection of an FRO. Plaintiff argues the decision is inconsistent with the facts because: the judge said S.C. was fifteen feet away when she overheard the conversation in Starbucks, whereas S.C. testified she sat just three feet away; defendant did not testify, yet the judge credited argument by his counsel that he was disputing the credit card charges to STI; the finding that plaintiff could not have known about STI until

after she obtained the TRO was wrong because plaintiff made the allegation in her domestic violence complaint; there was no testimony to support the judge's finding plaintiff was motivated to bring defendant before a rabbinical court as leverage in the divorce proceeding; the judge faulted plaintiff for delaying obtaining a TRO, yet plaintiff did so only after police confirmed the device taken from her car was a GPS tracker; and the judge erred in finding plaintiff did not fear defendant based upon plaintiff's courtroom demeanor in both the domestic violence and matrimonial matters.

In Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006) we outlined the analysis a trial judge must undertake when adjudicating a request for an FRO. We held:

> First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred. . . .    In performing that function, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'"  Cesare, []154 N.J. at 402 . . . (quoting Peranio[ v. Peranio], 280 N.J. Super. [47, ]54 [(1995)]).    Stated differently, when determining whether a restraining order should be issued based on . . . the predicate act[], the court must consider the evidence in light of whether there is a previous history of domestic violence, and whether there exists immediate danger to person or property. See N.J.S.A. 2C:25-29[(a)](1) and (2).

. . . .

The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim.

. . . .

Although this second determination . . . is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse.

[Silver, 387 N.J. Super. at 125-27.]

Stalking is an enumerated predicate act of domestic violence. N.J.S.A. 2C:25-19(a)(14). N.J.S.A. 2C:12-10(a) defines stalking as follows:

(1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.

(2) "Repeatedly" means on two or more occasions.

14

(3) "Emotional distress" means significant mental suffering or distress.

(4) "Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

N.J.S.A. 2C:12-10(b) states:

A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

The record supports the trial judge's findings that plaintiff failed to prove either the predicate act of stalking or the need for the protection of an FRO. It is true S.C. testified she sat three feet away when she heard the conversation in Starbucks. However, the trial judge's misstatement of the distance does not convince us there was reversible error. Indeed, the judge rejected S.C.'s testimony for several other reasons, including that: S.C. waited a day to tell plaintiff about the conversation, despite S.C.'s professed alarm about what she overheard; neither plaintiff nor S.C. immediately contacted the police; and plaintiff and S.C. were good friends and also had an employer-employee relationship, yet they never discussed the outcome of the incident after S.C. relayed the information to plaintiff. The judge concluded these factors

15

undermined S.C.'s credibility and the judge's mistaken recitation of one facet of S.C.'s testimony is not cause for us to disturb her credibility findings to which we owe deference. The error cited by plaintiff was harmless. R. 2:10-2.

We also reject the argument defendant was required to testify about his credit card bills in order to have them admitted into evidence because plaintiff admitted the documents in her case in chief. Those statements reflected the STI charges for $24.95 bearing an asterisk as well as credits in the same amount. The statements explained the asterisks as follows: "*This statement contains a security credit adjustment for a charge disputed as unauthorized." Therefore, defendant's testimony was unnecessary to prove these facts, especially considering plaintiff testified to the charges credited back to defendant's card on cross-examination.

Similarly, the objective evidence in the record proved plaintiff received the credit card statements showing the charges to STI seven days after she filed the domestic violence complaint. Even though the complaint alleged plaintiff "discovered that def[endant] hired a company named [Spytech]," her testimony did not overcome the objective evidence defendant produced undermining her claim. Our review of the record does not convince us to reach a different conclusion.

Finally, we have no cause to disturb the trial judge's findings that plaintiff did not require an FRO because she did not fear defendant and delayed filing a domestic violence complaint for strategic reasons. We have previously cautioned against using a domestic violence action to gain the upper hand in a pending divorce litigation. Murray v. Murray, 267 N.J. Super. 406, 410 (App. Div. 1993).

Here, the record amply supports the trial judge's findings that plaintiff filed the domestic violence complaint in order to avoid an impending adverse outcome in the divorce litigation. The judge relied on more than plaintiff's delay to conclude the filing was motivated by considerations other than domestic violence. Likewise, we have no basis to second guess the judge's observations that plaintiff did not fear defendant. This, coupled with lack of credible evidence of a repeated course of conduct orchestrated by defendant to follow, monitor, observe, surveil, threaten, or communicate with plaintiff to cause her significant mental suffering, distress, or fear required to prove stalking, convinces us there was no reversible error.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17