**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2764-16T2

C.Y.R., f/k/a C.Y.S.
and C.S.,[1]

    Plaintiffs-Appellants,

v.

C.M.,

    Defendant-Respondent.

_____

        Argued April 12, 2018 — Decided June 13, 2018

        Before Judges Simonelli, Rothstadt and Gooden
        Brown.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Middlesex
        County, Docket No. FD-12-1805-15.

        Jennifer E. Presti and Lynne Strober argued
        the cause for appellants (Mandelbaum Salsburg,
        PC, attorneys; Jennifer E. Presti, on the
        briefs).

        Joy A. Anderson argued the cause for
        respondent (Law Office of Joy Anderson, LLC,
        attorneys; Joy A. Anderson, on the brief; Jeff
        Thakker, of counsel and on the brief).

---

[1]    We use initials and fictitious names to identify the
participants in this matter pursuant to Rule 1:38-3(d).

PER CURIAM

This matter involves a third-party custody dispute over three-year-old E.M. (Edward) between his biological father, defendant C.M. (Conrad), and the child's maternal aunt and uncle, plaintiffs C.Y.R. (Catherine) and C.S. (Charles) (collectively, plaintiffs). Following a ten-day custody trial, the court held plaintiffs failed to rebut the presumption of custody in favor of Conrad by clear and convincing evidence of exceptional circumstance based on psychological parentage. We agree and affirm.

I.

Background Facts

Edward was born in October 2014. C.M.S. (Carol) is Edward's biological mother. Carol and Conrad were not married, but they lived together and jointly raised Edward until Carol's death.

In November 2014, the family became involved with the New Jersey Division of Child Protection and Permanency (Division) when Conrad was arrested for simple assault following a domestic violence incident with Carol. The charges were later dismissed when Carol declined to pursue the matter or seek a restraining order. The Division found that abuse and neglect of Edward was "not established" against either parent, but provided them

domestic violence counseling. The Division closed the file after the couple completed counseling.

On April 21, 2015, Carol died of a stab wound. According to Conrad, he and Carol were arguing over her text messaging another person, a physical altercation ensued, Carol retrieved a knife, they struggled over the knife, and Carol accidentally stabbed herself in the chest. Following an investigation, the Middlesex County Prosecutor's Office did not charge Conrad in connection with Carol's death.

Edward was in the apartment at the time of the altercation. The police notified the Division and asked Conrad's sister to take custody of Edward, which the Division approved. The Division initiated an investigation, but did not seek emergent removal of Edward from Conrad because they found he was safe with his father. However, on the day Carol died, plaintiffs filed an emergent order to show cause (OTSC), seeking temporary custody of Edward. Catherine certified that defendant was "suspected of murdering [her] sister[,]" she feared for Edward's life, Edward would not be cared for, and Carol designated them in her Last Will and Testament to be the child's guardians.

On April 21, 2015, the court entered an ex parte OTSC granting plaintiffs temporary legal and residential custody of Edward "pending the completion of the investigation against . . . [Conrad]

and pending further [o]rder of the [c]ourt[.]"[2]  The court set May 27, 2015 as the return date for the OTSC.

On April 27, 2015, Conrad filed a pro se motion for an order granting him sole legal and physical custody of Edward, and subsequently retained an attorney to represent him.  On April 29, 2015, Conrad visited the Division's office and discussed his plan for Edward's return to his custody.  He reported that Carol's family was calling him a murderer and expressed his concern that his son would be alienated from him while in their care.  He also reported he was diagnosed with Post Traumatic Stress Disorder resulting from witnessing Carol's death, and was actively engaged in therapeutic services.  He expressed his willingness to comply with whatever the Division requested of him and agreed to undergo a psychological evaluation and sign release forms in connection with his mental health care.

On May 13, 2015, Conrad underwent a psychological evaluation with Carolina Mendez, Ph.D. to assess his parenting ability, mental status, and treatment needs.  Mendez recommended that he undergo a more comprehensive, in-depth evaluation of his risk of engaging

---

[2]  It is unclear from the record whether the court was referring to the Prosecutor's investigation, the Division's investigation, or both.

in domestic violence in the future, as well as individual therapy that incorporated domestic violence counseling.

Mendez testified at the custody hearing, but not as an expert witness. She testified consistent with her report and reiterated her concern about Conrad's history of domestic violence and criminal activity.[3] She re-emphasized the need for defendant to undergo a more in-depth evaluation and recommended his parenting time be supervised time until then.

In a May 27, 2015 order, the court continued plaintiffs' temporary legal and physical custody of Edward, granted Conrad supervised parenting time every Saturday for two hours, and ordered Conrad to continue individual therapeutic services the Division offered and cooperate with Mendez's recommendation that he undergo a more in-depth evaluation. Catherine's husband, J.R. (John), a law enforcement officer, supervised Conrad's parenting time.

On June 12, 2015, the Division completed its investigation and found "[t]he allegations of neglect, substantial risk of physical injury/environment injurious to health and welfare . . . to [Edward] . . . [were] not established." However, the Division

---

[3] Defendant apparently has convictions for eluding law enforcement and resisting arrest, playing of loud radio, phonograph or musical instrument, obstructing the administration of law or governmental function, and noncompliance with posted restrictions at a State park. There are no judgments of conviction in the appellate record.

asked the court to order Conrad to comply with updated recommendations Mendez made after she reviewed additional records, specifically, that he complete anger management, undergo a substance abuse evaluation, and participate in a parenting skills program.

On June 19, 2015, Conrad visited the Division's office and inquired about parenting skills classes. He expressed his continued willingness to comply with the Division's recommendations, as well as his concern that he was not receiving the full amount of supervised parenting time the court granted him.

In a July 2, 2015 order, the court ordered Conrad to comply with Mendez's updated recommendations and continued his supervised parenting time. In a September 17, 2015 case management order, the court set discovery deadlines and continued plaintiffs' temporary legal and physical custody of Edward and Conrad's supervised parenting time.

On September 30, 2015, Conrad completed a parenting skills program. On October 26, 2015, the Division advised the court that Conrad was participating in counseling through the Fatherhood Training Program and an anger management program.

In a November 2, 2015 order, the court increased Conrad's supervised parenting time to four hours every Saturday and granted

him additional supervised parenting time on Wednesday evenings, to be supervised by his parents, rather than John. On November 16, 2015, Conrad completed the Fatherhood Training Program and also completed an anger management program.

On February 19, 2016, the Division advised the court that Conrad completed parenting skills and anger management programs, but had not engaged in domestic violence counseling. The Division also advised that Conrad declined to complete a substance abuse evaluation and home inspection on the advice of his attorney. The court subsequently directed Conrad to complete a substance abuse evaluation, participate in domestic violence counseling, and submit to a home inspection.

On March 10, 2016, Conrad completed a substance evaluation. He did not test positive for any illicit substances and there was no recommendation for substance abuse treatment. On March 14, 2016, the Division advised the court that it had referred Conrad to domestic violence counseling, but the provider would not accept him due to the pending criminal investigation of Carol's death. On March 24, 2016, the Division completed an inspection of Conrad's home and found no safety issues. Thereafter, at the conclusion of the first day of the custody hearing on June 8, 2016, the court granted Conrad unsupervised overnight parenting time on alternating weekends and Wednesday.

Plaintiffs' expert, Diane Travers, a licensed social worker, conducted a bonding evaluation between Edward and Catherine. The evaluation included three home visits and collateral interviews with Catherine and John, their children, Catherine's parents, and Carol's friend, T.V. A significant portion of the evaluation involved completion of the Groves Bonding Checklist, which rates preschoolers to assess their attachment to adults.

Travers noted in her report there was a secure attachment and bond between Edward and Catherine, which they formed prior to Carol's death. Travers concluded there would be a negative impact on Edward, both physically and mentally, if the bond were broken through removal from Catherine's custody. She testified at the custody hearing consistent with her report and opined there was a "psychological parent bond" between Catherine and Edward. Plaintiffs presented no evidence that Charles had formed a psychological parent bond with Edward.

Conrad's expert, Andrew Brown, Ph.D., a psychologist, conducted a bonding evaluation between Conrad and Edward that included Conrad's other children. Brown stated in his report that he observed Conrad engaging positively with Edward, and concluded Edward was "genuinely enjoying the company of his natural father"

8                                        A-2764-16T2

and "display[ed] comfort, security and confidence" with him. Brown found Edward "relat[ed] to [his father] in a natural and relaxed manner[,]" there were "no episodes of hesitance or reluctance to be in close proximity to [his father,]" and the "[a]ffection [was] reciprocated, eye contact [was] mutual and interactions [were] intimate." Brown concluded "[t]hese were all sign of a child who has formed a deep attachment." Brown also noted that Edward "demonstrate[d] that he is attached to his half siblings."

Brown determined there was a secure attachment between Conrad and Edward and "a potential that any arrangement leading to the forced severance of this attachment will result in irreparable psychological harm and trauma to [Edward]." He opined "[w]ithin a reasonable degree of psychological certainty," that Edward "is attached to his natural father" and the attachment should not be severed. He recommended "that the goal of family reunification be vigorously pursued and executed as soon as possible."

Brown also conducted a psychological evaluation of Conrad. He noted in his report that Personality Assessment Inventory revealed that Conrad did "not present with evidence for the presence of psychopathology or aberrant personality functioning[.]" The Culture-Free Self-Esteem Inventory, which measured Conrad's perception of self, resulted in scores in the

"high" range. The Beck Depression Inventory revealed that Conrad was not clinically depressed. The Child Abuse Potential Inventory revealed that Conrad had no indications toward the potential for physical child abuse. The Parenting Stress Index did not reveal any high parenting stress or defensiveness in Conrad. Finally, Brown found that Conrad's IQ was in the average range, and he "did not display any behavior symptomatic of thought disorder or psychosis." Brown concluded that Conrad's "[p]rognosis for parenting [was] good."

Brown testified at the hearing consistent with his two reports. He also testified that Conrad was friendly, loving, caring, and considerate, did "not pose as a threat to harm his . . . son" and "ha[d] the cognitive template required for parenting." Brown opined that Conrad did "not currently demonstrate any emotional or behavioral issues that would prevent him from executing parenting" and "demonstrat[ed] the capacity to mitigate separation [from plaintiffs]." Brown reiterated that Edward had a "deep emotional attachment to his father" and would suffer "problems, in terms of his development[,]" if their relationship was severed.

### The Division's Caseworkers

Division caseworkers confirmed that: the Division never sought to remove Edward from Conrad; it had no safety concerns for

10

the child when with his father; Conrad completed the requisite services; and the Division's recommended provider for domestic violence counseling rejected him because of the pending criminal investigation. A caseworker verified that Conrad was cooperative throughout the Division's investigation and had visited the Division's office to complain that the Division had not come to inspect his home despite his numerous calls to the Division. Another caseworker verified that Conrad called her "all the time" and visited her office several times to discuss the case with her and her supervisor.

The Trial Court's Decision

On March 7, 2017, the trial judge issued a comprehensive oral opinion, holding that plaintiffs failed to rebut the presumption of custody in favor of Conrad by clear and convincing evidence of exceptional circumstances based on psychological parentage. The judge conducted the two-step analysis for third-party custody disputes set forth in Watkins v. Nelson, 163 N.J. 235 (2000), which first required plaintiffs to rebut the presumption by clear and convincing evidence of parental unfitness, abandonment, gross misconduct, or existence of exceptional circumstances affecting the welfare of the child. The judge found plaintiffs did not

establish unfitness, abandonment, gross misconduct, or any wrongdoing by Conrad.[4]

The judge acknowledged that proof of psychological parentage could constitute exceptional circumstances. However, the judge determined plaintiffs did not prove exceptional circumstances because they did not establish prong one of the psychological parentage test set forth in V.C. v. M.J.B., 163 N.J. 200, 223 (2000), which required clear and convincing proof that Conrad consented to and fostered the parental relationship between plaintiffs.

The judge found plaintiffs failed to show Conrad was physically or emotionally absent, unable, or incapable of performing his parental duties. The judge also found that plaintiffs had not formed a psychological parentage bond with Edward and even if they did, Conrad did not consent to or foster it. The judge granted Conrad legal and physical custody of Edward, and ordered him to foster plaintiffs' relationship with the child, cooperate with visits with plaintiffs, and have Edward attend therapy to assist in his development.

---

[4] Plaintiffs do not challenge these findings.

On appeal, plaintiffs contend Catherine is entitled to custody of Edward because they presented proof that she is his psychological parent under the exceptional circumstances standard set forth in <u>Watkins</u> and <u>V.C.</u> Plaintiffs concede that Conrad did not consent to Catherine's formation and establishment of a parent-like relationship with Edward, but argue he impliedly consented and acquiesced to Catherine becoming Edward's psychological parent by his delay for over two years in completing evaluations and services the Division recommended, which caused Edward to remain in Catherine's custody. In the alternative, plaintiffs argue that Conrad's actual consent was not necessary because, by his delay, he yielded authority for Catherine to become Edward's psychological parent.[5]

Our review of a trial judge's factual findings, following a non-jury trial, is limited. <u>Elrom v. Elrom</u>, 439 N.J. Super. 424, 433 (App. Div. 2015). "Generally, 'findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.'" <u>Ibid.</u> (quoting <u>Cesare v. Cesare</u>, 154 N.J.

---

[5] Plaintiffs cite to unpublished opinions to support their arguments. However, unpublished opinions do not constitute precedent or bind us. <u>Trinity Cemetery Ass'n v. Twp. of Wall</u>, 170 N.J. 39, 48 (2001); <u>R.</u> 1:36-3.

394, 411-12 (1998)). In Family Part matters, this "[d]eference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (citation omitted). "Reversal is warranted only when a mistake must have been made because the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Elrom, 439 N.J. Super. at 433 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, 'its task is complete and it should not disturb the result[.]'" Ibid. (quoting Beck v. Beck, 86 N.J. 480, 496 (1981)). "Deference is appropriately accorded to factfinding; however, the trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review." Ibid. (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)). "Finally, legal conclusions are always reviewed de novo." Id. at 433-34 (citation omitted). Applying the above standards, we discern no reason to reverse.

As a threshold matter, we note plaintiffs did not cite to any statute in their complaint supporting the court's jurisdiction over this matter. Throughout the proceeding, the parties and the

14

judge referenced N.J.S.A. 9:2-4, N.J.S.A. 9:2-5, and N.J.S.A. 9:2-9, without specifically setting forth which one supported jurisdiction.

However, N.J.S.A. 9:2-4, the best interests of the child standard, "refers only to parents and does not refer to third parties[,]" <u>Watkins</u>, 163 N.J. at 244, and N.J.S.A. 9:2-5[6] does not apply because Carol was not Edward's sole custodian at the time of her death. We conclude that jurisdiction fell under N.J.S.A. 9:2-9, which provides as follows:

> When the parents of any minor child or the parent or other person having the actual care and custody of any minor child are grossly immoral or unfit to be intrusted with the care and education of such child, or shall neglect to provide the child with proper protection, maintenance and education, or are of such vicious, careless or dissolute habits as to endanger the welfare of the child or make the child a public charge, or likely to become a public charge; or when the parents of any minor child are dead or cannot be found, and there is no other person, legal guardian or

---

[6]  N.J.S.A. 9:2-5 provides as follows, in pertinent part:

> In case of the death of the parent to whom the care and custody of the minor children shall have been awarded by the Superior Court, or in the case of the death of the parent in whose custody the children actually are, when the parents have been living separate and no award as to the custody of such children has been made, the care and custody of such minor children shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect.

agency exercising custody over such child; <u>it shall be lawful for any person interested in the welfare of such child to institute an action in the Superior Court, Chancery Division, Family Part, in the county where such minor child is residing, for the purpose of having the child brought before the court, and for the further relief provided by this chapter</u>.

[(Emphasis added).]

"N.J.S.A. 9:2-10 then allows a court, in an action brought by a third party pursuant to N.J.S.A. 9:2-9, to award custody of the child to that third party." <u>Watkins</u>, 163 N.J. at 244.

When read together, N.J.S.A. 9:2-4, N.J.S.A. 9:2-9, and N.J.S.A. 9:2-10:

indicate that in a custody dispute between a parent and a third party, the public policy of this State is that <u>a presumption exists in favor of the parent. A third party can overcome that presumption by satisfying the standard required for termination of the rights of a non-consenting parent: unfitness, abandonment, gross misconduct, or "exceptional circumstances</u>."

[<u>Watkins</u>, 163 N.J. at 244-45 (emphasis added).]

The court must conduct a two-step analysis when a third party seeks custody of a child over the child's natural parent. First, a third party can overcome the presumption in favor of the natural parent by presenting clear and convincing evidence of parental unfitness, abandonment, gross misconduct, or the existence of

exceptional circumstances affecting the welfare of the child. Watkins, 163 N.J. at 253-55.

Second, once the first prong is met, the court can then consider the best interests of the child test articulated in N.J.S.A. 9:2-4(c). Id. at 254. "[I]n custody determinations between a fit parent and a third party, as opposed to claims made between two fit parents, the child's best interests become a factor only after the parental termination standard has been met, rather than the determinative standard itself." Id. at 253 (emphasis added). "[T]he best interest of the child cannot validly ground an award of custody to a third party over the objection of a fit parent without an initial court finding that the standard for termination of the rights of a non-consenting parent or the 'exceptional circumstances' prong has been satisfied." Id. at 255.

This case only involves exceptional circumstances. The exceptional circumstances doctrine is grounded in the court's power of parens patriae to protect minor children from serious physical or psychological harm. Id. at 246-47. This standard "always requires proof of serious physical or psychological harm or a substantial likelihood of such harm" and is to be determined on a case-by-case basis. Id. at 248. Proof that a third party has become a child's psychological parent by assuming the role of

17

his or her legal parent who has been unable or unwilling to undertake the obligations of parenthood will suffice to establish exceptional circumstances. Id. at 254; V.C., 163 N.J. at 219. Such proof will place the third party "in parity" with the legal parent. V.C., 163 N.J. at 227-28, 230.

To demonstrate the existence of a psychological parentage, the third party must prove four elements:

> [1] the legal parent must [have] consent[ed] to and foster[ed] the relationship between the third party and the child; [2] the third party must have lived with the child; [3] the third party must [have] perform[ed] parental functions for the child to a significant degree; and most important, [4] a parent-child bond must [have] be[en] forged.
>
> [Id. at 223.]

As to element one, the legal parent must have been a "participant in the creation of the psychological parent's relationship with the child" by

> ced[ing] over to the third party a measure of parental authority and autonomy and grant[ing] to that third party rights and duties vis-à-vis the child that the third party's status would not otherwise warrant[, thereby creating the likelihood that the third party would develop a profound bond with the child.]
>
> [Id. at 224.]

"[T]he focus is on [the legal parent's] intent during the formation and pendency of the parent-child relationship." Ibid. Absent

consent, the legal parent "has the absolute ability to maintain a zone of autonomous privacy for [himself] and [the] child."  Ibid.

The record confirms that Conrad did not consent to plaintiffs' custody of Edward or to the formation and establishment of a parentage relationship between Catherine and the child.  The record also confirms that Conrad did not impliedly consent or acquiesce to the creation of a psychological parent relationship or yield authority for Catherine to become Edward's psychological parent.  Rather, the record shows that Conrad's separation from Edward was entirely involuntary, he contested plaintiffs' custody from the very outset of this litigation and took immediate steps to regain custody, and he actively sought out and cooperated with the Division in order to be reunified with his son.  Any delay in completing the Division's services was not attributable to Conrad's affirmative or unjustifiable actions.

Further, Conrad was never absent physically or mentally from Edward or found to be unable or incapable of performing his parental duties.  He remained in his son's life throughout this protracted litigation, maintained a deep and secure bond with his son, took active steps to regain custody, and the Division found him to be a capable parent who posed no risk of harm to the child.  We are satisfied the judge correctly found that plaintiffs failed to rebut the presumption of custody in favor of Conrad by clear

and convincing evidence of exceptional circumstances based on psychological parentage.

                                  III.

Plaintiffs argue the court erred by transferring custody to Conrad without taking his testimony and making findings of fact or conclusions of law as to his credibility, character, or ability to care for Edward under the best interests of the child standard articulated in N.J.S.A. 9:2-4(c). Plaintiffs also argue the court failed to apply an adverse inference against Conrad after he asserted his Fifth Amendment right against self-incrimination. These arguments lack merit.

Watkins made clear that, if the third party seeking custody over a natural parent fails to satisfy the first prong of the Watkins test, the inquiry ends and the court need not consider the best interests of the child second prong. 163 N.J. at 253. Because the judge properly found plaintiffs failed to satisfy the first prong of the Watkins test, he was not required to consider the best interests of the child articulated in N.J.S.A. 9:2-4(c). Accordingly, there was no need for Conrad's testimony to determine Edward's best interests.

Nevertheless, for the sake of completeness, we address plaintiffs' argument that the court must always base its custody decision on all factors relevant to the child's best interests.

Plaintiffs cite to In re Baby M, 109 N.J. 396, 456 (1988) to support this argument. There, a biological father entered into a surrogacy contract with a surrogate mother, who refused to relinquish custody. Id. at 412. The court invalidated the surrogacy contract as being against public policy, but nonetheless found that the biological father was entitled to custody based on the best interests of the child after considering various factors, including each parent's stability, finances, and employment, among other factors. Id. at 457-60. This case is distinguishable because Conrad was entitled to a presumption of custody in his favor and the judge did not need to consider the best interests of the child because plaintiffs failed to rebut that presumption. Watkins, 163 N.J. at 253.

Plaintiffs cite to D.A. v. R.C., 438 N.J. Super. 431, 454 (App. Div. 2014), to argue that, despite the testimony of mental health practitioners, it is the court's ultimate responsibility to determine what custody arrangement is in the best interests of the child. In D.A., where a parent sought to change the child's custody arrangement, the trial court failed to consider the relevant statutory framework. Id. at 433. We remanded the matter with instructions to do so. Id. at 461. In contrast here, the judge made repeated reference to the requisite authority and properly applied it. Thus, D.A. does not apply.

Plaintiffs also cite to <u>Terry v. Terry</u>, 270 N.J. Super. 105, 118 (App. Div. 1994), a child custody case which required trial courts to set forth the statutory criteria for any custody analysis. The judge here amply satisfied <u>Terry</u> through his repeated reference to the <u>Watkins</u> standard.

Lastly, plaintiffs allege the judge abdicated his parens patriae role when he rendered a decision without hearing Conrad's testimony, contending that such failure "created a substantial potential for irreparable physical and psychological harm." However, the record does not support plaintiffs' bare allegations, and it is clear the judge was not required to hear Conrad's testimony because plaintiffs failed to overcome their burden under the first prong of the <u>Watkins</u> test. Moreover, there was ample evidence that a return of custody to Conrad was in Edward's best interests, including expert testimony. Accordingly, the judge did not err in rendering a custody decision without having heard Conrad's testimony.

In addition, the judge did not err in failing to draw an adverse inference from Conrad's refusal to testify after asserting his Fifth Amendment right against self-incrimination. Courts may draw an adverse inference where a party refuses to testify in a civil matter. <u>See</u> <u>State, Dep't of Law & Public Safety, Div. of Gaming Enf't v. Merlino</u>, 216 N.J. Super. 579, 587 (App. Div. 1987).

The inference may be "drawn only if there is other evidence supporting an adverse finding; it must not alone constitute the evidence of guilt." Ibid. (citation omitted). An adverse inference is a discretionary evidential ruling by the trial court. See Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 474 (App. Div. 2012).

While the adverse inference is discretionary, trial courts have alternative remedies, such as barring that party from offering any testimony, including testimony which inures to their benefit. Attor v. Attor, 384 N.J. Super. 154, 170 (App. Div. 2006). Such alternatives are consistent with the ruling in Mahne v. Mahne, 66 N.J. 53, 61 (1974), a divorce case in which the husband invoked the Fifth Amendment as to allegations of adultery and the Supreme Court allowed trial courts "broad choices of sanctions when dealing with good faith exercises of the privilege[.]" Further, in Attor, a matrimonial matter cited by plaintiffs, the wife invoked the Fifth Amendment as to separate immigration proceedings, fearing that she could be implicated for providing false testimony to immigration officials. Attor, 384 N.J. Super. at 161. Although the court found her invocation was improper because she was not really at risk of criminal charges, we determined that, had her invocation been proper, the trial court "should then either have drawn an adverse inference against defendant or struck her

testimony[.]" Id. at 170. Here, the judge followed Attor and Mahne by barring Conrad's testimony on his behalf.

Next, plaintiffs cite In re Guardianship of D.J.M., 325 N.J. Super. 150, 155-56 (Ch. Div. 1999), to illustrate an example wherein a biological mother was compelled to testify despite invoking the Fifth Amendment as to charges that she sexually assaulted the minor child. However, trial court opinions do not constitute precedent and are not binding on us. S & R Assocs. v. Lynn Realty Corp., 338 N.J. Super. 350, 355 (App. Div. 2001). In any event, the case does not apply. There, the biological mother requested a stay of the Division's guardianship action pending resolution of criminal charges, citing the Fifth Amendment. Id. at 152-53. The court denied a stay, explaining that the delay necessitated by a stay was contrary to the child's best interests and need for permanency. Id. at 161-62. The court also explained that the biological mother "may testify and invoke the Fifth Amendment in response to particular inquiries." Ibid. Because the judge here was not required to reach the best interests of the child test articulated in N.J.S.A. 9:2-4, Conrad's testimony, including particular inquiries outside the criminal investigation and Carol's death, was not necessary and there was no need to compel his testimony or draw an adverse inference.

Plaintiffs also cite <u>New Jersey Division of Youth & Family Services v. S.S.</u>, 275 N.J. Super. 173 (App. Div. 1994) to argue in favor of an adverse inference. However, that case concerned a parent who refused to testify after the Division had successfully shifted the burden for her to prove non-culpability, and her "oral testimony was simply one means of several available to her to demonstrate her non-culpability." <u>Id</u>. at 181. Here, Conrad had no burden of proof and no reason to testify. Thus, there was no need for an adverse inference.

We are satisfied the judge committed no error by transferring custody to Conrad without taking his testimony or in failing to apply an adverse inference after invocation of the Fifth Amendment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2764-16T2